IN THE UNITED STATES DISTRICT COURT
THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| Dewanna Johnson, Sheilla Nathan, | * | |
| Alonzo Tutson, Evora Sykes, Chanell Hobbs, | * | |
| Revisha Silas, Evette Townsend, | * | |
| Plaintiffs, | * | |
| | * | Case No. 4:25-cv-00418 |
| | * | |
| v. | * | JURY DEMAND |
| | * | |
| Providence Homeowners Association, | * | |
| FirstService Residential Texas, Inc., | * | |
| Defendants. | * | |

## COMPLAINT

### Table of Contents

I.     Introduction…………………………………………………………………1
II.    Jurisdiction and Venue……………………………………………………...3
III.   Parties………………………………………………………………………3
       A. Plaintiffs………………………………………………………………...3
       B. Defendants……………………………………………………………...4
IV.    Facts………………………………………………………………………...4
       A. Background……………………………………………………………..4
       B. Lead up to enactment of the Rules……………………………………….7
       C. Enactment of the Rules…………………………………………………10
       D. Aftermath of enactment of the Rules……………………………………12
       E. Texas Outlaws the HOA's prohibition on renting to voucher
          tenants and the PHOA Board enacts new rental restrictions……………………13
       F. Intimidation and Harassment Throughout the Process…………………………..14
       G. The facts demonstrate the Village of Arlington Heights evidence
          of violation of the Fair Housing Act because of race or color…………………..15
       H. The ban on vouchers caused a disparate impact on Black voucher tenants……...16
       I. The ban on vouchers caused a disparate impact on female head
          of household voucher tenants……………………………………………16
       J. The enacted rental restrictions cause a disparate impact on
          female head of household renters……………………………………….17
V.     Plaintiffs' Facts……………………………………………………………18
       Dewanna Johnson……………………………………………………………18
       Sheilla Nathan (Tutson)……………………………………………………...19
       Alonzo Tutson………………………………………………………………20

Evora Sykes……………………………………………………………………21
Chanell Hobbs……………………………………………………………………21
Revisha Silas…………………………………………………………………...22
Evette Townsend…………………………………………………………………23
VI.    Plaintiffs were injured by Defendants' discriminatory housing practices…………..24
VII.   Class Action Allegations…………………………………………………………24
VIII.  Claims for Relief………………………………………………………………27
Count I – Racial Dicrimination………………………………………………...27
Count II – Racially Hostile Intimidation and Harassment…………………………27
Count III - Rules banning vouchers caused a significant
racial disparate impact……………………………………………………………28
Count IV- Rules banning voucher tenants and enacting the rental
restrictions caused a significant disparate impact on the basis of sex, female……...28
IX.    Prayer for Relief………………………………………………………………...29
X.     Jury Demand……………………………………………………………………30
Signature……………………………………………………………………...31

I.    **Introduction**

1.     This case involves Defendants' actions that twice enacted rules prohibiting members of

the Providence Homeowners Association (PHOA) from renting to Housing Choice Voucher

(voucher) tenants, if the property owner chose to do so, and other rental restrictions that work to

ban voucher holders from residing in PHOA. The rules were enacted with the purpose of

excluding Black or African American residents from living in PHOA. The discriminatory

housing practices by Defendants PHOA and its property manager Defendant FirstService

Residential, Texas, Inc. (FirstService) made housing unavailable because of race and color and

discriminated in the terms and conditions of rental of dwellings because of race and color and

sex in violation of the Fair Housing Act. The discriminatory housing practices include

Defendants' failure to take meaningful action to address the intimidation, the racial hostility, and

the harassment because of race against voucher tenants, against owners renting PHOA homes to

voucher tenants, and against members of the PHOA who opposed the ban on renting to voucher

tenants.

2.     On January 14, 2025, the Secretary of the U.S. Department of Housing and Urban

Development (HUD) issued a Charge of Discrimination against Providence Homeowners

Association, FirstService Residential, Jennifer Dautrich, and Cody Watson regarding fifty-three

administrative Fair Housing Act Complaints filed with HUD. In this Charge, the HUD Secretary

has determined that reasonable cause exists to believe that discriminatory housing practices

have occurred because of race in violation of the Fair Housing Act with respect to these 53

complaints and authorized and directed the issuance of the Charge of Discrimination.[1]

---

[1] The Redacted HUD Notice and Charge of Discrimination (Charge) and Determination of
Reasonable Cause (Determination) is Exhibit 1 to this Complaint.

3.      The 53 HUD Complaints were brought by voucher tenants, owners of PHOA property

who rented homes to voucher tenants, two housing authorities, and PHOA residents who

opposed the ban renting to voucher tenants and rental restrictions. These Complaints alleged

that the PHOA, FirstService, PHOA Board President Jennifer Dautrich, and property manager

Cody Watson discriminated because of color or race in violation of the Fair Housing Act

through the enactment and enforcement of rental rules that prohibited homeowners from renting

to tenants who receive assistance through the federally subsidized voucher program that is also

known as Section 8.

4.      The Fair Housing Act mandates that any resolution of HUD's Charge of Dicrimination

shall require the consent of the aggrieved persons on whose behalf the Charge is issued. 42

U.S.C. §3612(e).

5.      Plaintiffs are 7 Complainants covered by this Charge of Discrimination and

Determination of Reasonable Cause. Plaintiffs and Counsel for Plaintiffs received the Charge of

Discrimination on January 14, 2025.

6.      Since an election was made by a party to the Charge after HUD issued the Charge, the

Fair Housing Act mandates that the U.S. Attorney General commence and maintain a lawsuit on

behalf of the aggrieved parties in a United States District Court 30 days after an election by a

party has been made pursuant to 42 U.S.C. § 3612(o)(1). Despite this statutory mandate, the

U.S. Attorney General did not file a lawsuit on behalf of the aggrieved parties at the expiration

of thirty days from the elections that had been timely made. The U.S. Attorney General does not

intend to file a lawsuit despite the issuance of this Charge of Discrimination.

7.      If the U.S. Attorney General of the Department of Justice had prosecuted the lawsuit

pursuant to the Charge, the Fair Housing Act requires that Attorney General prosecute the case

at no cost to the aggrieved persons. 42 U.S.C. § 3612(o)(1); EX 1- p. 3 (pdf).

8.     In addition to their individual claims, Plaintiffs Dewanna Johnson and Sheilla Nathan seek to represent a Rule 23(b)(2) class for injunctive relief of all aggrieved persons who have been harmed by Defendants' ban on leasing to voucher tenants, other rental restriction policies and racial hostility actions. The class does not include the two housing authority complainants. Plaintiffs Johnson and Nathan also seek to represent a Rule 23(b)(3) damages class of voucher tenants harmed by the enactment of the rules.

**II.  Jurisdiction and Venue**

9.     This Court has jurisdiction pursuant to 42 U.S.C. §1331 and 42 U.S.C. § 3613(a).

10.    Even without a Charge of Discrimination, Plaintiffs, who are aggrieved persons, may file their own private lawsuit under the Fair Housing Act without regards to whether or not the U.S. Attorney General files suit pursuant to 42 U.S.C. § 3613(a).

11.    Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in Providence Village, Texas which is located in Denton County within the Eastern District of Texas and because the property at issue is located in Providence Village.

**III. Parties**

**A.  Plaintiffs**

12.    Plaintiffs Dewanna Johnson, Sheilla Nathan (formerly Tutson), Alonzo Tutson, Evora Sykes, Chanell Hobbs, Revisha Silas, and Evette Townsend are voucher tenants who resided in Providence HOA during the rental rule restrictions and other discriminatory actions. These Plaintiffs are Black or African American. Plaintiffs Dewanna Johnson, Sheilla Nathan, Evora Sykes, Chanell Hobbs, Revisha Silas, and Evette Townsend are females.

13.    Plaintiffs are all "aggrieved persons" within the definition of the Fair Housing Act. 42 U.S.C. § 3602(i).

14.     In addition to their individual claims, Plaintiffs Dewanna Johnson and Sheilla Nathan seek to represent a Fed. R. Civ. P. 23 (b)(2) class of all aggrieved persons injured by Defendants' actions and discriminatory housing practices and a Fed. R. Civ. P. 23(b)(3) class of voucher tenants for damages from defendants' practices. These proposed classes do not include the Denton Housing Authority or McKinney Housing Authority and their separate lawsuits and claims.

15.     All Plaintiffs filed an administrative complaint of discrimination under the Fair Housing Act with HUD concerning the facts set out in this Complaint. Their HUD complaint tolls the statute of limitations for Fair Housing Act claims during the pendency of the administrative complaint pursuant to 42 U.S.C. § 3613(a)(1)(B).

### B. Defendants

16.     Defendant Providence Homeowners' Association or PHOA is a homeowners' association for a neighborhood of single-family homes in Providence Village, Texas and is a non-profit corporation incorporated under Texas law on June 12, 2022.

17.     Defendant FirstService Residential, Texas, Inc. is a property management company that provides property management services to PHOA pursuant to a contract for services. The Texas Corporate Office for FirstService Residential, Texas, Inc. is 14951 N. Dallas Pkwy., Ste 600, Dallas, Texas 75254.

### IV. Facts

### A. Background

18.     The Town of Providence Village (Town) is an outer-ring suburb of Dallas, Texas, containing five Homeowners Associations, one of which is PHOA which includes over 2,250 houses. EX 1- p. 18.

19.     Providence HOA has several unofficial social media groups that often contain explicitly racist and threatening posts, including concerning voucher holders. PHOA Board members belong to and actively engage with content in these groups. EX 1- pp. 18, 20, 26.

20.     From 2018 through 2022, the number and concentration of Black residents in Providence HOA was increasing. As of 2022, households were 74% White and 14% Black, its households were 66% owners and 34% renters, and 4% of households used vouchers. EX 1- pp. 18, 26.

21.     Around July 2021, following an altercation between a Black teenager and a White teenager, residents began blaming voucher-holders for crime and other problems in Providence HOA, often using racial language, such as "ghetto." EX 1- p. 18. The Defendants lacked evidence of voucher holders responsible for crime, but Board members continued to assign blame to voucher tenants on social media.

22.     As of 2021, only 4% of households in Providence HOA used vouchers. Ninety-three percent of voucher-households in Providence HOA are Black. EX 1- p. 18.

23.     HUD reports show that 94% of the voucher-households in Providence Village are female head of households as of 2022 and 95% were so as of 2023.

24.     The vast majority of the renters in Providence Village are not voucher tenants. The majority of non-voucher renters in Providence Village are White non-Hispanic. According to U.S. Census data, as of 2022 there were over 400 White non-Hispanic renters in Providence Village.

25.     The majority of single head of household renters in Providence Village are female head of households. U.S. Census data for 2023-2025 shows total a total of 646 family households. Of the single head of household renters there are 237 female head of household renters and only 17 male head of household renters.

26.    The largest federal subsidy in Providence Village is Federal Housing Administration insured and guaranteed home loan mortgages which cover 38% of all of the home loan mortgages in Providence Village. HUD reported that there were 616 Federal Home Administration insured mortgages in the 2010 U.S. Census Tract 201.06 as of 09/24/2023. PHOA is included in Census Tract 201.06. This is one of the highest FHA loans per housing unit in the Dallas Fort Worth MSA. By contrast to 38% of home mortgages insured and guaranteed by significant federal subsidy of FHA loans, only 2-5% of the homes were rented to federal voucher tenants.

27.    Federal voucher tenants typically pay 30% of their income to lease a home with a federal housing voucher. 24 C.F.R. § 982.1(a).

28.    The Denton County Appraisal District (DCAD) reported the average market value of homesteaded homes in Providence Village was $234,922 in 2020 and reported that it increased to $246,174 in 2021. It increased to $308,463 in 2022 and to $364,393 in 2023 according to DCAD records.

29.    PHOA is run by a Board of Directors in accordance with three governing documents: the Articles of Incorporation, the Bylaws of Providence Homeowners Association, Inc., and the Declaration of Covenants, Conditions, & Restrictions ("Declaration"). Jennifer Dautrich became PHOA Board President on April 7, 2022. She had been an active Board member since 2019, serving first as Treasurer and then Vice President. EX 1- p. 26.

30.    The Declaration gives the PHOA authority for the overall development, administration, maintenance and preservation of the homes and property in PHOA. The Declaration and PHOA Rules are binding on all Persons having any right, title or interest in the PHOA properties and runs with the title to the property.

31.     PHOA exercises significant power over the properties in its jurisdiction, including enforcing rules and collection fees. These PHOA powers have governmental qualities.

### B.  Lead up to enactment of the Rules

32.     Around 2018, the PHOA Board of Directors began discussing their perception that the number of rental units in their community was growing and that this was causing problems. What was, in fact, increasing in the PHOA during this time was the number and concentration of Black residents. EX 1- p. 27.

33.     HUD's Charge finds and states facts that the events discussed below occurred against a backdrop of escalating tensions in Providence HOA that largely played out in several unofficial social media groups for the HOA. Though the groups were unofficial, many Board members belonged to them and actively engaged with their content. These groups often contained explicitly racist and threatening posts. For example, one post included a photo of a Black man altered to have a rope around his neck, with the caption "This one is not coming back tomorrow." In another post, someone wrote "Borrow a paintball gun. Light them asses up with a florescent yellow paint ball. It would contrast nice with their dark skin." EX 1- p. 26.

34.     Around July 2021, Board members and other homeowners in the Town began focusing their concerns specifically on renters using vouchers, even though voucher holders continued to comprise an extremely small percentage of the neighborhood's population. EX 1- p. 27.

35.     For several months during 2021, Mr. Cody Watson, the FirstService employee who was the property manager for PHOA, and the PHOA Board worked together to draft the Rental and Leasing Rules (the "Rules"). The Rules prohibited owners from renting to voucher tenants, and imposed other restrictions on rental housing, such as allowing only one rental per property owner. Mr. Watson and the Board acted despite initially being told by the mayor and others that such restrictions might violate fair housing laws. EX 1 – p. 18.

36.    During this period, unofficial PHOA social media groups started to become filled with posts blaming voucher-holders for crime and other problems using racial language, such as "ghetto." For example, someone posted "You ever thought maybe some of us don't want to live amongst ghetto poverty crime ridden mentality people? … we get nervous because your type of ghetto minded folks bring the crime level up and make it a dangerous neighborhood." Board members also blamed voucher-holders for crime in social media posts. For example, one Board member wrote "it's called Section 8," then later continued, "It seems like the neighborhood is plagued with convicts, GET OUT!!!" EX 1 – p. 27.

37.    FirstService employee and PHOA property manager, Cody Watson, worked with PHOA on steps they could take to limit voucher-holders in their neighborhood. At the time, Mr. Watson advised the Board that he thought such actions would be unlawful and that his manager at FirstService agreed. Ms. Dautrich, however, appealed to someone higher up at FirstService, and after that Mr. Watson continued to assist the PHOA Board with their efforts to limit voucher tenants. On October 29, 2021, Ms. Dautrich posted on social media that she spoke to officials in Savannah (a nearby neighborhood also managed by FirstService) and that the Board had "been fed misinformation" but will meet in a few weeks to discuss. EX 1 – p. 28.

38.    Residents of PHOA provided their views to the PHOA Board on these efforts to limit voucher tenants, often by tagging them in posts on social media. For example, one owner tagged Ms. Dautrich in a post that said:

 "I think the main things is just to be careful how you word it in the bylaws … it can't come off as being discrimination against protected classes (race, sex, etc). It's usually easier to put bylaws with restrictions on rentals (number allowed per investor, total % of the neighborhood, etc) which then results in fewer section 8 types/fewer rentals overall." EX 1 – p. 28.

39.    The Rules were based on those from Savannah, and Mr. Watson exchanged over ten drafts with the PHOA Board during this process. Mr. Watson flagged that restrictions on

voucher-holders would be a challenge to enforce because PHOA and FirstService did not track rentals, let alone which tenants used vouchers, but the Board dismissed these concerns and vaguely discussed hiring additional staff. EX 1 – p. 28.

40.    The Rules provided that no rental home could be publicly financed or subsidized. The ban in the Rule is entitled "Section 8 Housing Restriction," but it bans all forms of government assistance. They also prohibited short term rentals, limited owners to one rental property, and required owners live in the home for a period of time before renting it out. The Rules stated that owners could be charged hundreds of dollars per week for noncompliance with the Rules. EX 1 - p. 28.

41.    The PHOA Board's governing documents did not give it the authority to directly enact the Rules; rather a vote by a majority of property owners was needed. On November 30, 2021, Ms. Jennifer Dautrich, proposed amending PHOA's governing documents to give the Board the authority "to adopt rules for the rental, leasing, and tenant occupancy" (the "Amendment") instead of conducting a vote on the Rules themselves. EX 1- p. 18.

42.    In support of the Rules, Ms. Dautrich discussed property maintenance and crime in the general area, but she did not support her conclusions with any data. EX 1 - p. 18. Defendants have since claimed that the Rules were necessary to address crime, maintenance issues, and property values, but HUD found that Defendants have no comprehensive sources of information to show that these were real problems– let alone problems cause by voucher-holders- when they began pursuing the Rules, nor have they acquired such information. EX 1- p. 18.

43.    The Dallas, Denton, and McKinney Housing Authorities prohibit giving vouchers to tenants for violent or drug-related activity or other criminal activity which may threaten the health, safety or right to peaceful enjoyment of the premises. 24 C.F.R. § 982.553; Housing Authority Administrative Plans. Voucher tenants will lose their voucher if engaged in such

criminal activity while leasing with a voucher. Plaintiffs do not have such criminal convictions and have maintained eligibility for their vouchers.

### C.  Enactment of the Rules

44.    Voting for the Amendment opened on February 7, 2022. The Board planned to hold the vote open until enough votes were received for the Amendment to pass, which they had not done for prior amendments. EX 1- p. 18.

45.    In response to dozens of emails, on February 15, 2022, FirstService included a "Q&A" about the Amendment and a link to the draft Rules in its weekly email newsletter. The Q&A made clear that "No lease, Section 8 or otherwise, will be terminated immediately." FirstService included the full Q&A in its newsletter at least a dozen more times. EX 1 – p. 19.

46.    Landlords with voucher tenants reached out to the PHOA Board to ask that if crime or maintenance issues were truly the concern the Board provide them with additional details so they could address any specific problems. The Board never responded to these requests. EX 1 -p. 19.

47.    While voting was ongoing, posts about voucher-holders in the PHOA unofficial social media groups were rampant with racial posts. For example, one post showed the mug shots and arrest record for a Black man, who the poster presumed was a voucher-holder, with the caption "Damn this ghetto ass neighborhood is on a roll!!! Hide Your kids cause section 8 is on the loose!!!" The post garnered about 100 comments, many of them using extreme language in talking about voucher-holders, such as one referring to the man as a "the dumb ass sec 8 pos" and another referencing "ghetto trashy areas that are full of pos renters and section 8." Ms. Dautrich joined the comments on this post to promote the Amendment. EX 1 – p. 19.

48.    Around April 2022, Ms. Dautrich organized a group of twenty-three homeowners – including another PHOA Board member – to form an Amendment Committee, which went door-to-door trying to persuade owners to vote for the Amendment. Mr. Watson and the Board were in

contact daily to track how many more votes were needed, who voted, how they voted, and which houses the Committee should target next. EX 1 – p. 19.

49.    The PHOA Board and FirstService inundated owners with automated email reminders, the frequency of which Mr. Watson increased to daily. Board and Committee members also promoted the Rules heavily on social media. EX 1 – p. 19.

50.    No prior PHOA amendment efforts prompted the formation of a special committee, a coordinated canvassing campaign, or this level of promotion by FirstService or the Board. EX 1 – p. 19.

51.    In May 2022, the Amendment received enough votes to pass, so Mr. Watson closed online voting. On June 1, 2022, in a special open meeting, the Board provided owners one last chance to vote even though they knew that the Amendment had already passed. EX 1 – p. 19.

52.    On June 6, 2022, in another open meeting, the Board voted unanimously to approve a revised version of the Rules, and on June 14, 2022, they were finalized and recorded. Despite earlier pledges not to displace residents immediately, the Rules as enacted did not preclude this. The Board announced that enforcement would begin in ninety days, and Mr. Watson told some residents it would begin in as little as thirty days. EX 1 - p. 19. These adopted Rules contained a "Section 8 Rent Restriction" governing the leasing of homes in PHOA that stated:

>    **Section 8 Housing Restriction.** A Rent House may not be used for a publicly financed or subsidized housing program, such as Section 8 Housing.

53.    The Rules also contained other rental restrictions on PHOA owners for leasing homes in PHOA including:

>    **One Rent House Limit**. A person may only own one Rent house in the Subdivision at a time. "Rent House" means an occupied house that is (x) not an Owner Occupied Home, or (y) a house that has been vacant for three (3) or more months. "Owner Occupied Home" means a house in which at least one occupant is an Owner or Owner's spouse, or is related to an Owner or Owner's spouse by blood, marriage, adoption, or formal guardianship, and for which occupants do not pay rent....

> **Initial Owner Occupancy Term**. An Owner must reside in the home for the first twenty-four (24) consecutive months after acquiring an ownership interest in the home before the Owner may rent or lease the home pursuant to these Lease Rules.

54.    The Leasing Rules were later revised to set fines of $200 per week for an owner's failure to register the rental with the HOA and $200 per week for "Unauthorized Rental."

55.    The Rules did not set out any procedure for the owner to follow to end a violation of the Section 8 Housing Restriction. The PHOA's governing Declaration provides that if the owner does not cure the violation, the PHOA may take enforcement action and impose fines in accordance with applicable law. The Rules specifically provide that the PHOA itself may take enforcement action against violations of the Rules without incurring any liability to the owner: "for any damages, including lost rents, suffered by the Owner in relation to the Association's enforcement of the Documents against the Owner's tenant." The governing Declaration gives the PHOA the ability to use self-help to remove any "person . . . that violates the Declaration or other governing documents." The self-help includes "force as may reasonably be necessary…."

56.    The PHOA Rules apply to all of the PHOA homes under the governing PHOA covenants.

## D.  Aftermath of enactment of the Rules

57.    With the enactment of the Rules, landlords in PHOA started telling voucher tenants that they had to move immediately, leading to frantic searches for alternative housing. In the wake of the Rules' enactment, several voucher-households have moved away from PHOA. EX 1 – p. 19.

58.    On June 8, 2022, several residents who opposed the Amendment gathered in a park by a lake to discuss the vote. An Amendment Committee member photographed the group, which included children, and another resident posted the photograph to social media with the caption "Here's a great pic depicting the very F**king Idiots that help to Ruin our lovely town of Providence Village!!" This incident was reported to Mr. Watson and the PHOA Board, explaining the fear it and other social media posts had caused. Mr. Watson and the Board had mediated other

neighborhood disputes, but the only action they took in response to this complaint was to put a reminder in their weekly newsletter about "our communal obligation to each other to uphold community standards." EX 1 - p. 20.

59.      After the Rules' passage, racist posts continued to fill the Town's unofficial social media groups. Sometimes these posts specifically named residents who had opposed the Amendment. These posts also often contained negative stereotypes of Black people and many were threatening. For example, one resident referred to voucher-holders as "wild animals" and "lazy entitled leeching TR@SH," while another post refenced "the hood mentality." Someone else posted an image of a Halloween costume labeled "Providence Village Renter." The label showed a photo of a Black woman, lists a "sassy attitude," "weapons," "a section 8 voucher," and "24 hours to live," and says "PREVIOUS FELONY CONVICTIONS INCLUDED!!!!" EX 1 - p. 20.

60.      On August 5, 2022, PHOA entered into an agreement with HUD staying enforcement of the Rules during the HUD investigation of the administrative complaints.

### E.  Texas Outlaws the HOA's prohibition on renting to voucher tenants and the PHOA Board enacts new rental restrictions

61.      On June 18, 2023, Texas passed a state law barring homeowner associations from restricting property owners' choice of renting to tenants based on the tenant's source of income, including housing choice vouchers, which became effective on September 1, 2023.

62.      On June 26, 2023, the PHOA Board adopted a resolution to amend the Leasing rules by removing all references to Section 8 Housing and adopting the Amended and Restated Leasing Rules.

63.      During the summer and fall of 2023, racial tensions in PHOA related to voucher holders continued to build. In July and November 2023, the National Justice Party (NJP), a White nationalist organization, protested just outside of Providence Village with fliers that said "an

overwhelming majority of section 8 recipients are composed of Black Americans" who bring

"unimaginable violence." EX 1 - p. 20. Many voucher tenants residing in PHOA received NJP

fliers on their doorstep along with a bag of deer corn.

64.     In February 2024, the Board met with their state representative to discuss alternative ways

to get voucher-holders out of PHOA.EX 1 - p. 20.

65.     On May 10, 2024, the Board adopted the "Second Amended and Restated Rental and

Leasing Rules," which limited owners to one rental property each. Because most voucher-

holders in Providence Village rented from a few large landlords, this rule would in practice have

similar results as the prior outright ban. The new rules also limited the number of rental units to

twenty-five percent of the lots in PHOA. EX 1 – pp. 21-22.

66.     On July 30, 2024, the PHOA Board adopted the "Third Amended and Restated Rental

and Leasing Rules." These new Leasing Rules continue the One Rent House Limit from the

original June 2022 Rules and continue the initial owner occupancy rule from the June 2022

Rules requiring the owner to reside in the home for the first 24 months prior to leasing. The 25%

Rental Cap enacted on May 10, 2024 remains in effect but has been expanded to require a PHOA

Owner to get on the PHOA waiting list if you desire to lease your home.

### F.  Intimidation and Harassment Throughout the Process

67.     HUD found that from the lead up to the Rules' enactment through its aftermath, residents

directed aggressive and threatening posts at voucher-holders. For example, one post said "Back

in the day, when a community didn't like someone they banned together to make said persons

life a living hell to the point they left." Another resident threatened "they might just leave in a

coroner's wagon!!" and "kids will get SHOT." Posts like these were also directed at residents

who supported voucher-holders and opposed Rules. Despite being well aware of such conduct,

neither the PHOA Board nor FirstService ever did anything meaningful to address it. EX 1-p. 21.

68.     Some posts were directed at female voucher tenants. For example, one post said "get your section 8 asses out of town now bitches [explosion emoji] and don't let the door hit you in your fat ass mouths!!" EX 1 - pp. 34-35.

69.     Many social media posts threatened bodily harm to Black voucher tenants. For example, one comment directed at Plaintiff Revisha Silas stated "All I know is that the property I just sold use to be the center trading town where they hung all the blacks [shrug emoji] look it up you live right next to it [laughing emoji]." EX 1 – p. 35.

70.     Defendants failed to take prompt action to correct the racial intimidation and harassment of Black PHOA residents and of voucher tenants.

71.     Despite being well aware of these actions and the distress they were causing, neither the Board nor FirstService took any meaningful actions to address them. PHOA Board members actively participated in the social media groups in which this content was posted. Several Board members admitted seeing aggressive comments in these groups, and Mr. Watson admitted having multiple discussions with Board members about them. Mr. Daniel Puffer, one PHOA resident who opposed the Rules, emailed Mr. Watson and the Board details of some of these incidents with screenshots, but they declined to do more than put a reminder about community standards in the weekly newsletter. EX 1 – p. 35.

72.     This inaction stands in contrast to the actions that Mr. Watson and the PHOA Board took regarding more minor incidents. Mr. Watson mediated many disagreements between residents, such as issues with dogs barking, cars blocking driveways, blocking mailboxes, trespassing, and not mowing lawns, among others. EX 1 – p. 35.

**G.  The facts demonstrate the *Village of Arlington Heights* evidence of violation of the Fair Housing Act because of race or color**

73. HUD made a Determination of Reasonable Cause that Defendants' discriminated on the basis of race and set forth factors according to the Supreme Court framework for circumstantial evidence according to the case *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). EX 1 - pp. 37-40. The facts set forth in HUD's Charge and Determination for these factors are incorporated into this Complaint. EX 1.

### H.  The ban on vouchers caused a disparate impact on Black voucher tenants

74. The enacted PHOA Rules banning voucher tenants are a change in policy that caused a significant disparate impact on Black voucher renters compared to Whites in violation of the Fair Housing Act. Prior to the PHOA ban on vouchers, leasing to voucher tenants was permitted and a small percentage of voucher tenants leased homes in PHOA. The voucher tenants in PHOA were predominantly Black. The policy banning PHOA homeowners from leasing to vouchers were the Rules enacted by the PHOA in June 2022 which caused the impact to be directed at the Black voucher tenants.

75. The Rules policy banning leasing to vouchers caused a statistically significant, adverse disparate impact on Blacks by banning a majority Black group of tenants from leasing in PHOA. The statistical measure of the rejection rate of Black occupied voucher units (92%) compared to White occupied voucher units (5%) greatly exceeds the standard measure for discrimination and is evidence of disparate impact caused by the PHOA ban on vouchers rule. The rejection rate ratio in 2023 is 18.4 which significantly exceeds the 1.25 rejection rate ratio measure for discrimination. The enacted ban directly and robustly caused the discriminatory effect on Blacks.

### I.  The ban on vouchers caused a disparate impact on female head of household voucher tenants

76. The enacted PHOA Rules banning voucher tenants and enacting rental restrictions are a change in policy that caused a significant disparate impact on females compared to males in

violation of the Fair Housing Act. Prior to the PHOA ban on vouchers, leasing to vouchers holders was permitted and a small number of voucher tenants leased homes in PHOA. This voucher population in PHOA was majority female head of households. The policy banning PHOA homeowners from leasing to vouchers were the Rules enacted by the PHOA in June 2022 and caused the impact on a predominantly female head of household group.

77.     The PHOA policy banning voucher tenants causes a statistically significant, adverse disparate impact on females by disproportionately impacting a 95% female head of household group. The enacted ban policy directly causes a statistically significant discriminatory effect on females. The statistical measure of the rejection rate of PHOA female head of household voucher units (95%) compared to male head of household voucher units (5%) greatly exceeds the standard measure for discrimination and is evidence of disparate impact caused by the PHOA ban on vouchers rule. The rejection rate ratio in 2023 is 19.0 which significantly exceeds the 1.25 rejection rate ratio measure for discrimination. The enacted ban directly and robustly caused the discriminatory effect on female head of household voucher tenants.

### J. The enacted rental restrictions cause a disparate impact on female head of household renters

78.     The policy of the enacted rental restrictions is a change in policy that disproportionately impacts female head of household renters compared to male head of household renters. Prior to the rental restrictions, there were no policies preventing the rental of PHOA homes and there was a disproportionately single female head of household rental population that came to live in PHOA compared to single male head of household renters. The policy enacting the PHOA rental restrictions was enacted by the PHOA in June 2022 and again in May and July 2024. The restrictions are the policy of limiting rental homes to only one per owner and the policy of requiring an owner to reside in the home for 24 months prior to leasing the home. These

restrictions limit the number of rental homes in PHOA and the rental restrictions disproportionately impact single female head of household renters.

79.      The policy restricting opportunities for leasing in PHOA causes a statistically significant, adverse disparate impact on single female head of household renters. The statistical measure of the rejection rate of PHOA single female head of household renters (34.5%) compared to single male head of household renters (2.47%) greatly exceeds the standard measure for discrimination and is evidence of disparate impact caused by the PHOA rental restriction rules. The rejection rate ratio in 2023 is 13.9 which significantly exceeds the 1.25 rejection rate ratio measure for discrimination. The enacted ban directly and robustly caused the discriminatory effect on female head of household renters.

**V. Plaintiffs' Facts**

**<u>Dewanna Johnson</u>**

80.      Plaintiff Dewanna Johnson is a female head of household Black voucher tenant who resided in PHOA during the enactment of the Rules and who continues to reside there. Ms. Johnson's children reside in the home with her.

81.      Ms. Johnson is a homeownership voucher tenant which means she is paying to own her home in PHOA. HUD explains that the Housing Choice Voucher (HCV) homeownership program allows families that are assisted under the HCV program to use their voucher to buy a home and receive monthly assistance in meeting homeownership expenses.  The program is limited to first-time homeowners who have received housing counseling and meet the minimum income requirements.

82.      When the Rules were enacted, Ms. Johnson felt unsafe and planned to move out of PHOA, but she could not find a landlord to lease a home to her with her voucher despite trying for three to four months and 15-20 houses. She felt like she was "living in hell" due to the

circulating racial hostility in PHOA. She does not allow her children to go to the pool or park or use the neighborhood amenities due to the racial hostility towards voucher tenants.

83.    Ms. Johnson continues to live in PHOA and is continuously aware of the ongoing racial hostility towards Black voucher tenants. Plaintiff suffered and continues to suffer emotional distress at the discrimination against voucher tenants because of race and because of the racial insults and hostility directed at voucher tenants on the PHOA social media sites.

**Sheilla Nathan (Tutson)**

84.    Plaintiff Sheilla Nathan (formerly Tutson) is a voucher tenant who resided at PHOA for over six years with her then husband Plaintiff Alonzo Tutson and their three children. Ms. Nathan was married to Plaintiff Alonzo Tutson at the time of the events in this complaint, but they are no longer married. Their children attended local public schools and Ms. Nathan and Mr. Tutson were active in their community. Both Ms. Nathan and Mr. Tutson were employed while living in PHOA and are employed now.

85.    Both Ms. Nathan and Mr. Tutson saw and have continued to see the scathing, insulting, and racially hostile social media comments made by persons representing themselves as PHOA members. They became concerned with the safety of their children in this hostile living environment. This has caused ongoing emotional distress for them.

86.    After the Rules were enacted in June 2022, their landlord asked them to move several months prior to the end of their lease. The owner and landlord of the PHOA home that they leased is not a natural person but is a corporate entity that did not reside in the home for the first 24 months after acquisition and thus did not meet the new rental rules. Ms. Nathan and Mr. Tutson had lived in the same house in PHOA with the same landlord for the entire time they lived there. Their landlord has asked them to move out sooner than the end of their lease because of the Rules banning voucher tenants and the rental restrictions on landlords.

87.     Being forced to move disrupted their lives and caused Ms. Nathan emotional distress. She had to engage in a difficult search to find new housing that would accept the voucher, and there were limited options available. She and Mr. Tutson had to relocate their children to new schools. They incurred expenses in moving as well as emotional distress at leaving their long-time home and community.

88.     Plaintiffs Sheilla Nathan's PHOA home was made unavailable to her because of race and her sex.

89.     Plaintiff Ms. Nathan suffered and continues to suffer emotional distress at the discrimination against voucher tenants because of race and because of the racial insults and hostility directed at voucher tenants on the PHOA social media sites.

**<u>Alonzo Tutson</u>**

90.     Plaintiff Alonzo Tutson resided in Providence HOA with his then wife Sheilla Nathan and their children for over six years. He and his wife leased a home in PHOA using a voucher. Plaintiff Alonzo Tutson is a U.S. veteran.

91.     In June 2022, Mr. Tutson was subjected to surveillance and video recording at a meeting with an ex PHOA board member and current city official to discuss the enactment of the Rules.

92.     Being forced to move disrupted his life and his family's lives and caused Mr. Tutson emotional distress. He and Ms. Nathan had to engage in a difficult search to find new housing that would accept the voucher, and there were limited options available. They had to relocate their children to new schools. They incurred expenses in moving as well as emotional distress at leaving their long-time home and community.

93.     Plaintiff Alonzo Tutson's PHOA home was made unavailable to him because of his race.

94.     Plaintiff Mr. Tutson suffered and continues to suffer emotional distress at the discrimination against voucher tenants because of race and because of the racial insults and hostility directed at voucher tenants on the PHOA social media sites.

**Evora Sykes**

95.     Plaintiff Evora Sykes is a voucher holder who rented a home in PHOA from April 2018 through July 2022. Ms. Sykes resided in the PHOA home with her two children until the Rules were enacted. Both of her children attended the local public school.

96.     As a result of the June 2022 PHOA rule banning voucher tenants, she was forced to move out of PHOA. The unexpected, involuntary move was difficult for Ms. Sykes and her family. The Complainant incurred expenses associated with moving to a new home. She has incurred other expenses related to this move. This caused emotional distress for her.

97.     After the PHOA new policy banning vouchers and restricting rentals was passed, there were many racial and intimidating statements made about voucher tenants in Providence Village on social media by white residents of Providence Village. There were racial and intimidating statements directed towards her. This intimidation and harassment was because of her race or color and was connected to her rental of her home. This has caused ongoing emotional distress for her.

98.     Plaintiff Sykes' PHOA home was made unavailable to her because of her race and sex.

99.     Plaintiff Sykes suffered and continues to suffer emotional distress at the discrimination against voucher tenants because of race and because of the racial insults and hostility directed at voucher tenants on the PHOA social media sites.

**Chanell Hobbs**

100.    Plaintiff Chanell Hobbs is a voucher tenant who leased a home in PHOA. She lived in PHOA with her three children. She moved to Texas in March 2021 to escape a domestic violence

situation. She moved into Providence Village in May 2022. Plaintiff Chanell Hobbs is referred to by her initials C.H. in the HUD Charge.

101.    Plaintiff moved out of PHOA because of the enactment of the Rules banning vouchers and the rental restrictions and was unable to complete her lease term due to the Rules. She was concerned with the academic effect of withdrawing her children in the middle of school and having to transfer to new schools due to the need to move. It was a stressful and difficult situation to find new housing that would accept her voucher and to move her children to new schools. She incurred moving expenses and other expenses in her housing search. She experienced emotional distress from being forced to move suddenly and from the racial and intimidating statements made about voucher tenants in PHOA.

102.    Plaintiff Hobb's PHOA home was made unavailable to her because of her race and sex.

103.    Plaintiff Hobbs suffered and continues to suffer emotional distress at the discrimination against voucher tenants because of race and because of the racial insults and hostility directed at voucher tenants on the PHOA social media sites.

**Revisha Silas**

104.    Plaintiff Revisha Silas is a voucher tenant who leased a home in PHOA. She resided at the home in PHOA with her four children. She moved to Texas to escape a domestic violence situation. She applied to over 100 places before finding an owner willing to lease a unit to her with a voucher.

105.    Plaintiff Revisha Silas moved into PHOA in May 2021. The lease was amended in April 2022 to extend the lease for another three years. However, the new leasing Rules enacted in June 2022 prevented her from completing her lease. The landlord of her PHOA home did not meet the rental restrictions enacted in the new June 2022 Rules. As a result of the new Rules, Ms. Silas had to move out of PHOA. She incurred moving expenses and other expenses in her housing

search. She experienced emotional distress from being forced to move suddenly and from the racial and intimidating statements made about voucher tenants in PHOA. Plaintiff Revisha Silas is referred to as R.S. in the HUD Charge.

106.    After the PHOA new policy banning vouchers and restricting rentals in PHOA was passed, there were many racial, hostile, and intimidating statements made about voucher tenants in Providence Village. Since the implementation of the policy, Ms. Silas has been experiencing racially hostile statements by white homeowners of Providence Village HOA directed towards her. She has video of residents filming her and her children. She has screen shots of social media posts with racially hostile, vicious, and hateful slurs directed towards her and the voucher families in PHOA. One racially intimidating and threatening post about her was a reference to lynching or hanging Blacks. Determination, page 12. HUD found that heated social media posts contained negative stereotypes of Black people, were threatening, and at times, specifically named Revisha Silas. EX 1 – p. 33.

107.    Another racially threatening social media post concerning voucher tenants threatened the voucher tenants' safety for remaining in PHOA. The post referenced the PHOA Rules being passed and it was now time for the voucher tenants to leave.

108.    Plaintiff Silas' PHOA home was made unavailable to her because of her race and sex.

109.    Plaintiff Silas suffered and continues to suffer emotional distress at the discrimination against voucher tenants because of race and because of the racial insults and hostility directed at her and at other voucher tenants on the PHOA social media sites.

**Evette Townsend**

110. Plaintiff Evette Townsend is a voucher tenant who leased a home in PHOA. At the time she resided in PHOA her five children under 18 and 1 child over 18 lived with her. The children

23

attended the local public school. She moved to PHOA in December 2021. Plaintiff Evette Townsend is referred to as E.T. in the HUD Charge.

111. As a result of the Rules banning vouchers and the rental restrictions she was forced to move out of her home prior to the lease ending date. She incurred moving expenses and other expenses in her housing search. Due to the difficulty of finding replacement housing that would lease to her with a voucher, she was forced to live farther away from her doctors as a result of being forced to relocate out of PHOA. She experienced emotional distress from being forced to move suddenly and from the racial and intimidating statements made about voucher tenants in PHOA.

112. After the HOA new policy banning vouchers and restricting rentals in Providence Village HOA was passed, there were many racial and intimidating statements made about voucher tenants in Providence Village on social media by white residents of Providence Village. There were racial and intimidating statements directed towards her. This intimidation and harassment were because of her race or color and was connected to her rental of her home.

113. Plaintiff Evette Townsend's PHOA home was made unavailable to her because of her race and sex.

114. Plaintiff Evette Townsend suffered and continues to suffer emotional distress at the discrimination against voucher tenants because of race and because of the racial insults and hostility directed at her and at other voucher tenants on the PHOA social media sites.

**VI.    Plaintiffs were injured by Defendants' discriminatory housing practices**

115. As a result of Defendants' discriminatory conduct, Plaintiffs suffered actual damages, including emotional distress. EX 1 - p. 21.

116.    The Defendants' discriminatory housing practices of enactment of the Rules and racial hostility and intimidation were intentionally inflicted on voucher tenants including Plaintiffs.

**VII.    Class Action Allegations**

24

117. Plaintiffs Dewanna Johnson and Sheilla Nathan seek to represent two classes: 1) a Fed. R. Civ. P. 23(b)(2) class of all aggrieved persons who were injured by Defendants' policies and actions for whom injunctive and declaratory relief is sought and 2) a Fed. R. Civ. P 23(b)(3) class of voucher tenants injured by the Defendants' policies and actions for whom an award of damages is sought. Both classes include all but two of the aggrieved parties identified by the HUD Charge: the Housing Authority of the City of Denton and the Housing Authority of the City of McKinney.

118. The first proposed class is the Rule 23(b)(2) class of all persons who as a result of the challenged voucher ban, rental restrictions and the racial hostility have suffered adverse effects because of Defendants' discrimination based on race or sex.

119. This proposed Rule 23(b)(2) class is so numerous that joinder is impracticable. The 51 aggrieved persons in the HUD Charge (without the 2 Housing Authority complainants) includes voucher tenants living in PHOA or who have moved out, PHOA owners who lease homes to voucher tenants or want to, and PHOA residents opposed to the voucher ban and rental restrictions. Additional aggrieved persons are Black and female voucher tenants who rent a home in PHOA. These voucher tenants leasing in the PHOA are estimated by HUD in the HUD Charge to be approximately 2-5% of the 2,250 total houses in PHOA, or 145 at the 5% estimate. This class includes additional aggrieved persons, including tenants renting with vouchers who would wish to live in PHOA if there were available homes for lease and no racial hostility by the PHOA members. The number of voucher tenants with vouchers in the surrounding cities has increased since 2022 and it is estimated that several would wish to live in PHOA.

120. There are common questions of law or fact common to the proposed Rule 23(b)(2) class. These facts are set out in the HUD Charge and this complaint. HUD issued the Charge based on the commonality of the issues of fact and law for the 53 Complainants.

121. Plaintiff Dewanna Johnson and Plaintiff Sheilla Nathan's claims are representative and typical of the claims of the proposed Rule 23(b)(2) class. The claims alleged in this complaint are at paragraphs 129-134 below and are typical of the claims of the Rule 23(b)(2) class.

122. The representative Plaintiffs will fairly and adequately protect the interests of the Rule 23(b)(2) class. Plaintiff Dewanna Johnson is a voucher tenant who continues to reside in PHOA and remains subject to the Defendants' actions. Plaintiff Nathan is a voucher tenant who needed to move because of the Defendants' policies.

123. The proposed Rule 23(b)(2) class is appropriate because the Defendants have acted on grounds that generally apply to the entire class. The adverse effects on the class include preventing voucher tenants in PHOA from 1) renting or continuing to rent and 2) inflicting terms and conditions of rental that are different based on race such as the racial hostility and intimidation from the PHOA. Other adverse effects prevent existing PHOA homeowners from leasing their homes in PHOA without first residing in them for 24 months and limiting the number of homes that can be leased to only one which will have a discriminatory effect because of race and sex and subject them to racial hostility arising out of and connected to the challenged rental restrictions.

124. This class is sought pursuant to Fed. R. Civ. P. 23(b)(2) in order to obtain injunctive and declaratory relief for the Defendants' actions based on race and sex. These grounds apply generally to the class and would make final injunctive or declaratory relief appropriate to the Rule 23(b)(2) class as a whole.

125. The second proposed class is the Fed. R. Civ. P 23(b)(3) class for the award of damages. The Rule 23(a) numerosity requirement is met. In addition to the 40 voucher tenants in HUD's Charge (with 78 children and 12 other adult household members), there are numerous voucher tenants residing in PHOA. HUD's Charge estimates the number of voucher tenants to be 2-5% of

the total homes in PHOA. HUD states that as a result of Defendants' discriminatory conduct, the voucher tenants who are HUD Complainants suffered actual damages, including emotional distress. EX 1 - p. 21.

126. The common questions of law and fact are those set out in HUD's Charge and in this complaint. The voucher tenants have all experienced injuries from the Defendant's enactment of the Rules and the ongoing racial hostility and intimidation. The claims of the Plaintiff representatives are typical of the Rule 23(b)(3) class. These claims are set out in this complaint at paragraphs 129-134.  Both Ms. Johnson and Ms. Nathan are voucher tenants who reside or resided in PHOA and have suffered injuries from Defendants' actions. They will fairly and adequately protect the interests of the class.

127. The common questions of law and fact predominate over individual questions making Rule 23(b)(3) class of voucher tenants appropriate.

128. Plaintiffs' counsel will seek appointment as class counsel per Rule 23(g). Plaintiffs' counsel have extensive experience in handling significant class actions, including those involving voucher tenants.

## VIII.   Claims for Relief

129. Plaintiffs incorporate all of the prior paragraphs of the Complaint for the claims for relief.

### Count I – Racial Discrimination

130. Defendants' policies and actions enacting the rules banning vouchers and the rental restrictions constitute discrimination on basis of race and color and violate the Fair Housing Act, 42 U.S.C. §3604(a), 24 C.F.R. §100.50(b)(3), 24 C.F.R. §100.70(d)(5), and 42 U.S.C. §3604(b), 24 C.F.R. §100.65(a).

### Count II - Racially Hostile Intimidation and Harassment

131. Defendants' actions creating and causing racially hostile intimidation and harassment of aggrieved persons because of race or color or because of engagement of activity protected by the Fair Housing Act discriminate on the basis of race and color and violate 42 U.S.C.§3617. Black voucher tenants were repeatedly harassed because of their race or because of their pursuit of a fair housing complaint. Other aggrieved persons were harassed because of their race or because of the race of those they were supporting and/or because of their pursuit of a fair housing complaint. These actions were taken because of race and violate the Fair Housing Act, 42 U.S.C. §3617, 24 C.F.R. §100.400(b), (c)(2), (c)(4), and 24 C.F.R. §100.600. Defendants' failure to take action to address the racial hostility, threats and intimidation violate 42 U.S.C. §3617, 24 C.F.R. §100.7(a)(1)(iii).

### Count III – Rules banning vouchers caused a significant racial disparate impact

132. The enacted PHOA Rules banning voucher tenants are a change in policy that caused a significant disparate impact on Black voucher renters compared to Whites in violation of the Fair Housing Act. The enacted policy banning leasing to voucher tenants violates the Fair Housing Act, 42 U.S.C. §3604(a), 42 U.S.C. §3604 (b) and 24 C.F.R.§100.500, because of the race or color of the voucher tenants.

### Count IV – Rules banning voucher tenants and enacting the rental restrictions caused a significant disparate impact on the basis of sex, females

133. The enacted PHOA Rules banning voucher tenants and enacting rental restrictions are a change in policy that caused a significant disparate impact on females compared to males in violation of the Fair Housing Act. The enacted policy banning leasing to voucher tenants violates the Fair Housing Act, 42 U.S.C. §3604(a), 42 U.S.C. §3604 (b) and 24 C.F.R.§100.500, because of the sex of the voucher tenants.

28

134. The PHOA policy of the enacted rental restrictions is a change in policy that disproportionately impacts female head of household renters compared to male head of household renters. The enacted rental restriction policy violates the Fair Housing Act, 42 U.S.C. §3604(a), 42 U.S.C. §3604 (b) and 24 C.F.R.§100.500, because of the sex of the voucher tenants.

## IX. Prayer for Relief

135.     Plaintiffs request the following relief:

a.  Compensatory damages, including damages for emotional distress, and punitive damages,

b.  Declaratory relief that Defendants' discriminatory housing practices violated the Fair Housing Act, 42 U.S.C. §§ 3604(a), (b), 3617,

c.  Injunctive relief to enjoin Defendants, their agents, employees, and successors, and all other persons in active concert or participation with them to:

i.  Enjoin Defendants from the operation of the current PHOA rental restrictions,

ii.  Enjoin Defendants from enacting future rental restrictions that violate the Fair Housing Act,

iii.  Enjoin Defendants from discriminating because of race or color against any person in the sale or rental of a dwelling,

iv. Enjoin Defendants from coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, any right granted or protected by the Fair Housing Act,

v. Enjoin Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future,

vi. Enjoin Defendants to engage in training for PHOA and FirstService officials and employees on how to comply with the Fair Housing Act and how to prevent future discriminatory housing practices by the PHOA and FirstService,

vii.   Enjoin Defendants to take actions by PHOA and FirstService to prevent racial hostility, intimidation, threats for Black members of the PHOA, including 1) adopting rules that prohibit racial hostility and harassment actions that violate the Fair Housing Act, 2) to monitor the unofficial PHOA social media sites that are used by PHOA members and others to monitor for racial hostility and harassment statements that violate the Fair Housing Act and take appropriate measures to end the use of such hostility and harassment by persons 3) to take specific actions upon complaints from PHOA residents concerning racial harassment or intimidation, and

viii.   Any other appropriate injunctive relief.

a.   Reasonable attorneys' fees and costs

b.   Any such other and further relief deemed proper.

136. The Rule 23(b)(2) Class seeks the following relief:

a. Declaratory relief that the Defendants violated the FHA, 42 U.S.C. §§ 3604(a), (b), 3617,

b. Prospective injunctive relief applicable to the aggrieved persons of this class that is set out in 135.c. above,

c. Reasonable attorneys' fees and costs, and

d. Any such other and further relief deemed proper.

137. The Rule 23(b)(3) Class seeks the following relief:

a. Compensatory damages, including damages for emotional distress, and punitive damages,

b.       Reasonable attorneys' fees and costs, and

c.       Any such other and further relief deemed proper.

## X.       Jury Demand

138. Plaintiffs demand a jury trial on all triable issues triable by a jury.

Respectfully Submitted,

s/ Laura B. Beshara

Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net

Lead Counsel for Plaintiffs

s/ Michael M. Daniel

Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net

Attorneys for Plaintiff