

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410-0500

OFFICE OF THE GENERAL COUNSEL

## THESE ARE IMPORTANT LEGAL DOCUMENTS
## PLEASE READ THEM CAREFULLY

This envelope contains three legal documents regarding a **Charge of Discrimination** issued by the U.S. Department of Housing and Urban Development (HUD) pursuant to the federal Fair Housing Act.

### YOU SHOULD READ THEM ALL CAREFULLY

The first document is an Important Notice (Notice). IT **EXPLAINS YOUR RIGHTS AND RESPONSIBILITIES UNDER THE FAIR HOUSING ACT.** The Notice includes explanations of important deadlines for filing documents with HUD's Office of Administrative Law Judges. Some of these deadlines require you to act quickly, so it is important that you read the Notice promptly. If you are a respondent in this action you have the right to file an answer by the deadline specified in Section II.A of the Notice. If you do not file an answer, you may be subject to a **Default Judgment** against you (see Notice Section II.A)

The second document is a Charge of Discrimination, which **CHARGES THAT THE RESPONDENT(S) IN THIS CASE HAS (HAVE) VIOLATED THE FAIR HOUSING ACT.**

The third document is the Determination of Reasonable Cause upon which the Charge of Discrimination is based.

## IMPORTANT LEGAL DOCUMENTS - READ CAREFULLY

Exhibit 1 - page 1

# IMPORTANT NOTICE

**THE ENCLOSED <u>CHARGE OF DISCRIMINATION</u> ISSUED BY THE SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT GIVES YOU THE FOLLOWING IMPORTANT RIGHTS AND RESPONSIBILITIES:**

## I. <u>Election of Civil Action or Administrative Proceeding</u>

If you are either the person charged or any aggrieved person on whose behalf this Charge is brought, you have the right to <u>choose</u> one of two judicial forums in which the issues involved in the Charge will be heard.  The two forums are: (1) a United States government administrative proceeding before an independent United States government administrative law judge; and (2) a United States federal district court (district court).

If you want to have your case tried in a United States government administrative proceeding, you need take no action.  <u>If you take no action and if no other person decides to go to federal district court</u>, an administrative hearing automatically will be held before an independent United States government administrative law judge.

If you want this matter to proceed to a U.S. federal district court, you must follow the procedure set forth at Section I.C of this Important Notice.

If no person elects to have this matter decided in a U.S. federal district court, an administrative hearing shall commence <u>within 120 days from the date of the Charge of Discrimination</u>, unless impracticable, in which case the administrative law judge will provide the parties with written notification of the reasons therefore.  The hearing shall be conducted at a place in the vicinity in which the discriminatory housing practice is alleged to have occurred or to be about to occur.  42 U.S.C. § 3612(b), (g); 24 C.F.R. § 180.600.

If no person elects to have this matter decided in a U.S. federal district court, the administrative law judge shall issue an Order setting forth the discovery schedule, the hearing date, and the location of the hearing.

The proceeding will be conducted in accordance with the Consolidated HUD Hearing Procedures for Civil Rights Matters set forth at 24 C.F.R. Part 180.

## A. <u>Advantages of Administrative Proceeding</u>

### 1. <u>Speed</u>

The administrative hearing process was created by Congress to provide for a quick and inexpensive way to resolve housing discrimination charges.  42 U.S.C. § 3612(d) and (g). The time from the issuance of the Charge until the issuance of the administrative law judge's decision is about six months.  In contrast, because of the large number of criminal cases in district courts,

Exhibit 1 - page 2

which, under the Speedy Trial Act, take precedence over all other cases, it is not uncommon for civil litigation such as fair housing cases to take on average at least two years to be litigated in district court.

## 2. Free HUD Counsel

If this case is tried in a United States government administrative proceeding, an attorney from the United States Department of Housing and Urban Development will prosecute the case on behalf of the aggrieved person at no charge. Providing the opportunity to have a United States Department of Housing and Urban Development lawyer prosecute the case was intended by Congress to give aggrieved persons expert advice from lawyers representing the Department that is in charge of implementing the Fair Housing Act.

## 3. Remedy

The administrative law judge may order injunctive and other equitable relief and monetary relief for actual damages (including damages caused by humiliation and/or emotional distress) and may also impose civil penalties payable to the government.

## B. Advantages of District Court Proceeding

## 1. Jury Trial

If this case proceeds to a district court, any party may choose to have the case decided by a jury.

## 2. Free Department of Justice Counsel

If the case proceeds to a district court, an attorney from the United States Department of Justice will prosecute the case at no charge.

## 3. Remedy

The district court may order injunctive and other equitable relief and monetary relief for actual damages (including damages caused by humiliation and/or emotional distress) and punitive damages.

## C. Procedure for Making an Election

If you want to have your case tried in district court, you must file a written notice of your election with the Docket Clerk, **no later than 11:59 p.m. eastern time on the 20th day following your receipt of the enclosed Charge of Discrimination**. 42 U.S.C. § 3612(a); 24 C.F.R. § 180.410(b)(2). The preferred method of document delivery is transmittal as scanned (pdf format) email attachments. If email service is not possible, transmission to the Docket Clerk via facsimile (fax) is also acceptable. Hardcopies of original filings are not permitted. To ensure timely receipt by the Docket Clerk, you may wish to request confirmation of receipt via

Exhibit 1 - page 3

email. Your election must be sent to the Docket Clerk via email or facsimile (fax) as indicated below:

If filing by scanned email attachment send to: alj.alj@hud.gov.

Facsimile
(202) 619-7304
Attn: Docket Clerk

In addition, you must give written notice of your election to go to federal district court to the following individuals using the same means (unless unavailable or impracticable) and at the same time as you provide notice to the Docket Clerk:

**COMPLAINANTS:**
Dewanna Johnson



Exhibit 1 - page 4



Exhibit 1 - page 5



Sheilla & Alonzo Tutson
c/o Laura Beshara and Michael Daniel
Daniel & Beshara, P.C.
3301 Elm St.
Dallas, TX 75226
laurabeshara@swbell.net; mchldnl@msn.com



Exhibit 1 - page 6

6



Evora Sykes
c/o Laura Beshara and Michael Daniel
Daniel & Beshara, P.C.
3301 Elm St.
Dallas, TX 75226
laurabeshara@swbell.net; mchldnl@msn.com

E.T.
c/o Laura Beshara and Michael Daniel
Daniel & Beshara, P.C.
3301 Elm St.
Dallas, TX 75226
laurabeshara@swbell.net; mchldnl@msn.com



Exhibit 1 - page 7



C.H.
c/o Laura Beshara and Michael Daniel
Daniel & Beshara, P.C.
3301 Elm St.
Dallas, TX 75226
laurabeshara@swbell.net; mchldnl@msn.com

R.S.
c/o Laura Beshara and Michael Daniel
Daniel & Beshara, P.C.
3301 Elm St.
Dallas, TX 75226
laurabeshara@swbell.net; mchldnl@msn.com



Exhibit 1 - page 8

8



Exhibit 1 - page 9



Denton Housing Authority
1225 Wilson Street
Denton, TX 76205
spratt@relmanlaw.com

McKinney Housing Authority

603 N. Tennessee St.
McKinney, TX 75069
rmiller@mckinneyha.org; kanderson@ccsb.com

**COMPLAINANTS REPRESENTATIVES:**

Counsel for McKinney Housing Authority
Katie Anderson
901 Main Street
Suite 5500
Dallas, Texas 75202
kanderson@ccsb.com

Counsel for Denton Housing Authority
Sara Pratt
Relman Colfax PLLC
1225 19th Street, N.W., Suite 600
Washington, DC 20036
spratt@relmanlaw.com

Counsel for R.S., Alonzo Tutson, Sheilla Tutson, Evora Sykes, E.T. and C.H.
Laura Beshara and Michael Daniel
Daniel & Beshara, P.C.
3301 Elm St.
Dallas, TX 75226
laurabeshara@swbell.net; mchldnl@msn.com

**RESPONDENTS:**
Providence Homeowners' Association
c/o FirstService Residential Texas
14951 North Dallas Parkway, Suite 600
Dallas, TX, 75254-7892, USA

Jennifer Dautrich

Exhibit 1 - page 10

███████████████
Providence Village, TX 76227-7547

FirstService Residential, Texas Inc.
Corporation Service Company
211 E. 7th Street, Suite 620
Austin, TX 78701

Cody Watson
███████████████████

**RESPONDENTS' REPRESENTATIVES:**
Counsel for Providence Homeowners Association and Jennifer Dautrich
David Talbot and Sarah Smith
Dinsmore & Shohl LLP
600 Travis Street, Suite 7350
Houston, TX 77002
David.Talbot@Dinsmore.com; Sarah.Smith@Dinsmore.com

Counsel for FirstService Residential, Inc. and Cody Watson
Roger McCleary and James Burnett
Parsons McEntire McCleary PLLC
One Riverway, Suite 1800
Houston, TX 77056
rmccleary@pmmlaw.com
jburnett@pmmlaw.com

**OFFICIALS:**

David Berman
Rebecca Coy
Julia Dykstra
Palmer Heenan
Trial Attorneys
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh Street, SW, Room 10249
Washington DC 20410
David.M.Berman@hud.gov, Rebecca.M.Coy@hud.gov, Julia.Dykstra@hud.gov;
Palmer.T.Heenan@hud.gov

Ayelet R. Weiss
Assistant General Counsel for Fair Housing Enforcement
Office of General Counsel

Exhibit 1 - page 11

U.S. Department of Housing and Urban Development
451 Seventh Street, SW, Room 10249
Washington DC 20410
Ayelet R.Weiss@hud.gov

Kathryn Price
Kimberly Quirk
Trial Attorneys
U.S. Department of Housing and Urban Development
Region VI
307 W. 7th Street
Suite 1000
Fort Worth, TX 76102
Kathryn.E.Price@hud.gov; Kimberly.A.Quirk@hud.gov

Allyssa Wheaton Rodriguez
Associate Regional Counsel of Litigation
U.S. Department of Housing and Urban Development
Region VI
307 W. 7th Street
Suite 1000
Fort Worth, TX 76102
Allyssa.D.WheatonRodriguez@hud.gov

Lynn M. Grosso
Deputy Assistant Secretary for Enforcement
Office of Fair Housing and Equal Opportunity
U.S. Department of Housing and Urban Development
451 Seventh Street, SW, Room 5204
Washington DC 20410
Lynn.M.Grosso@hud.gov

Elizabeth A. Singer
Director, U.S. Attorney's Fair Housing Program
Housing & Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW—4CON
Washington DC 20530
*For deliveries, use 150 M St., NE, Rm. 8.212,*
*Washington DC  20002*
Elizabeth.Singer@usdoj.gov
Fax: (202) 514-1116

        If a timely election to proceed in federal district court is made, the administrative proceeding will be dismissed.

Exhibit 1 - page 12

12

## II. Procedural Rights and Responsibilities for Administrative Proceeding

### A. Answer

If you are the respondent in the administrative proceeding, you may file a written answer to the attached Charge by **February 13, 2025** (within 30 days of service of the Charge). 24 C.F.R. § 180.410(b)(4)(ii); 24 C.F.R. § 180.405(d). The preferred method of document delivery is transmittal as scanned (pdf format) email attachments. If email service is not possible, transmission to the Docket Clerk via facsimile is also acceptable. Hardcopies of original filings are not permitted. The answer should be filed ) at:

If filing by scanned email attachment send to:
alj.alj@hud.gov.

Facsimile
(202) 619-7304
Attn: Docket Clerk

Any such answer shall include:

1. A statement that the respondent admits, denies, or does not have and is unable to obtain sufficient information to admit or deny, each allegation made in the Charge. A statement of lack of information shall have the effect of a denial. Any allegation that is not denied shall be deemed admitted.

2. A statement of each affirmative defense and a statement of the facts supporting each affirmative defense.

**NOTE**: If you decline to file an answer by the date specified above, it shall be deemed an admission of all matters of fact recited in the Charge of Discrimination and may result in the entry of a default decision. 24 C.F.R. § 180.420(b).

### B. Request for Intervention

If you are the aggrieved person on whose behalf the attached Charge was filed, you may participate as a party in the administrative proceeding by filing a timely request for intervention. In order for requests for intervention to be timely, they must be filed with the Docket Clerk by **March 5, 2025** (within 50 days after the filing of the Charge). 24 C.F.R. § 180.310(b).

### C. Discovery

All discovery for the administrative proceeding will be completed 15 days before the date scheduled for the hearing (see Section I, above) or at such time as the administrative law judge shall direct. 24 C.F.R. § 180.500(a). If no person elects to have the claims asserted in this Charge decided in a civil action in district court, a lawyer from the United States Department of

Exhibit 1 - page 13

13

Housing and Urban Development will contact you or your representative to discuss the discovery of information relevant to transactions and events related to the enclosed Charge.

In order to meet your discovery obligations (for either an administrative proceeding or a proceeding in federal court), you should maintain in their current form any and all records, documents, files, or tapes that could pertain to this matter.  Discovery of electronic information is treated on equal footing with paper documents.  Electronically stored information is defined expansively to include <u>any</u> type of information that is stored on a computer or other electronic medium, including, but not limited to:  email messages and attachments; other electronic communications; word processing documents; spreadsheets; tables; data; photographs; sound recordings, and telephone logs.  These materials may not be destroyed or altered pending the outcome of this litigation.  The destruction or alteration of any evidence concerning this matter could result in sanctions.

To meet your discovery obligations, you should take all reasonable steps to:

- Prevent deleting or discarding any information, including electronic information, related to the matters described in the enclosed Charge of Discrimination.

- Assess how information, including electronic information, is stored, how it can be produced, and what evidence is relevant to the case.

### III.  <u>Restrictions on Respondent's Sale or Rental of Property</u>

If at any time following the service of the attached Charge, the respondent intends to enter into a contract, sale, encumbrance, or lease with any person regarding the property that is the subject of the Charge, the respondent must provide a copy of the Charge to such person before the respondent and that person enter into the contract, sale, encumbrance or lease.  24 C.F.R. § 180.410(b)(5).

If there is anything in this notice that you do not understand or if you have additional questions, contact: Julia Dykstra at 202-402-2508 or Julia.dykstra@hud.gov**.**

Enclosures:  Charge of Discrimination
                Determination of Reasonable Cause
                Motion to Proceed via Pseudonym

Exhibit 1 - page 14

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF HEARINGS AND APPEALS



|  |  |
|---|---|
| Department of Housing and Urban Development, on behalf of ▉▉▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉▉▉, ▉▉▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉▉▉, ▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉, ▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉▉, ▉▉▉▉, ▉▉▉▉, and ▉▉▉▉ | HUD OHA No: _____ |

) ) ) ) ) **FHEO Case Nos: 06-22-4391-8,**
**06-22-4448-8, 06-22-4452-8,**
**06-22-4488-8, 06-22-4489-8,**
**06-22-4492-8, 06-22-4494-8,**
**06-22-4495-8, 06-22-4504-8,**
**06-22-4505-8, 06-22-4506-8,**
**06-22-4507-8, 06-22-4508-8,**
**06-22-4524-8, 06-22-4543-8,**
**06-22-4583-8, 06-22-4627-8,**
**06-22-4628-8, 06-22-4630-8,**
**06-22-4631-8, 06-22-4647-8,**
**06-22-4648-8, 06-22-4663-8,**
**06-22-4668-8, 06-22-4669-8,**
**06-22-4746-8, 06-22-4768-8,**
**06-22-4784-8, 06-22-4786-8,**
**06-22-4787-8, 06-22-4805-8,**
**06-22-4809-8, 06-22-4810-8,**
**06-22-4827-8, 06-22-4848-8,**
**06-22-4849-8, 06-22-4912-8,**
**06-22-4927-8, 06-22-4967-8,**
**06-22-4991-8, 06-22-5007-8,**
**06-22-5090-8, 06-22-5127-8,**
**06-22-5149-8, 06-22-5149-8,**
**06-22-5153-8, 06-23-5670-8,**
**06-23-5756-8, 06-23-6137-8,**
**06-23-6311-8, 06-23-6350-8,**
**06-23-6365-8, 06-23-6388-8.**

Charging Party,

v.

Providence Homeowners Association, Inc.,
FirstService Residential Texas, Inc.,
Jennifer Dautrich, and
Cody Watson,

Respondents.

Exhibit 1 - page 15

## CHARGE OF DISCRIMINATION

**I.      JURISDICTION**

Between June 24, 2022, and June 3, 2023, Complainants filed fifty-three timely Complaints with the U.S. Department of Housing and Urban Development ("HUD"), that were amended between September 13, 2023 and November 8, 2023. The Complaints, as amended alleged that Providence Homeowners Association Inc. ("PHOA"), the president of its board Jennifer Dautrich, its property management company, FirstService Residential Texas, Inc. ("FirstService"), and its property manager Cody Watson discriminated because of race and color in violation of the Fair Housing Act ("Act") through the enactment and enforcement of rental rules that prohibited, inter alia, homeowners from renting to tenants who receive assistance through the Housing Choice Voucher ("HCV") Program.[1]

The Act authorizes the Secretary of HUD to issue a Charge of Discrimination ("Charge") on behalf of aggrieved persons following an investigation and a determination that reasonable cause exists to believe that a discriminatory housing practice has occurred. *See* 42 U.S.C. § 3604(g)(1)-(2); 24 C.F.R. § 103.400(a). The Secretary has delegated that authority to the General Counsel, 24 C.F.R. §§ 103.400, 103.405, who has re-delegated that authority to the Associate General Counsel for Fair Housing and the Assistant General Counsel for Fair Housing Enforcement. 76 Fed. Reg. 42,462, 42,465 (July 18, 2011).

By a Determination of Reasonable Cause and No Reasonable Cause issued contemporaneously with this Charge, the Regional Director of the Office of Fair Housing and Equal Opportunity for Region VI has determined that reasonable cause exists to believe that discriminatory housing practices have occurred in this case and has authorized and directed the issuance of this Charge. *See* 42 U.S.C. § 3610(g)(1) and (2)(A); 24 C.F.R. § 103.400(a).

**II.     LEGAL AUTHORITY AND FACTUAL BASIS FOR THIS CHARGE**

Based on the Department's investigation of the allegations contained in the aforementioned Complaints and the Determination of Reasonable Cause and No Reasonable Cause, Respondents are charged with violating the Act as follows:

**A.  Legal Authority**

1.  It is unlawful to make a dwelling unavailable because of race or color. 42 U.S.C. § 3604(a); 24 C.F.R. § 100.50(b)(3).

2.  It is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of … rental of a dwelling, or in the provision of services … in connection therewith" because of race or color. 42 U.S.C. § 3604(b); 24 C.F.R. § 100.65(a).

3.  It is unlawful "to interfere with any person … on account of his having exercised … any right granted or protected" by the substantive provisions of the Act. 42 U.S.C. § 3617; 24

---

[1] The Complaints also alleged discrimination based on sex, national origin, familial status, and disability, but the Department issued a no reasonable cause determination on these bases due to lack of information supporting such claims at this time.

2

Exhibit 1 - page 16

C.F.R. § 100.400(b).  Such prohibited conduct includes "[r]etaliating against any person because that person has made a complaint … under the Fair Housing Act."  24 C.F.R. § 100.400(c)(5).

4. Intimidation and harassment because of race or color or because of engagement in an activity protected by the Fair Housing Act is unlawful.  42 U.S.C. § 3617; 24 C.F.R. §§ 100.400(b), (c)(2), (c)(4), 100.600.  This prohibited conduct includes third parties failing to take prompt action to correct and end such intimidation and harassment when they knew or should have known of the intimidation or harassment and had the power to correct it.  24 C.F.R. § 100.7(a)(1)(iii).

## B. Parties

5. Forty Complainants (belonging to thirty-six households) are tenants who receive HCVs and reside in Providence Village, or did so at the time of the events discussed in this Determination.  Those Complainants are



6. Eleven Complainants own properties in Providence Village and rent to tenants receiving HCVs.  Those Complainants are

7. Two Complainants are Housing Authorities that administer HCVs in Providence Village. Those Complainants are the McKinney Housing Authority and the Denton Housing Authority.

8. Four Complainants are residents of Providence Village who opposed the actions described in this Determination and the loss of the important benefits from living in a racially integrated community that they allege these actions will cause.  These Complainants are                                  are Black.                              are White.

9. At least twelve additional adult household members and seventy-eight minor children of Complainants are "aggrieved persons" as defined by Subsection 802(i) of the Act.  42 U.S.C. § 3602(i); 24 C.F.R. § 100.20.

10. Respondent PHOA is a homeowners' association for a neighborhood in Providence Village, Texas and a non-profit corporation, incorporated under Texas law on June 12, 2022.

---

[2] This Complainant filed her Complaint using the name                , but later informed HUD that she now uses the last name "        "

[3] Five Complainants are subject to protective orders under the Violence Against Women Act.  For that reason, this Charge identifies them by their initials rather than their full names.

Exhibit 1 - page 17

11. Respondent Jennifer Dautrich has been the president of PHOA since April 7, 2022, before which she was its vice president.

12. Respondent FirstService provides property management services to PHOA.

13. Respondent Cody Watson is a FirstService employee who was the property manager for PHOA from 2009 until December 31, 2022.

### C. Factual Allegations

14. The Town of Providence Village is an outer-ring suburb of Dallas, Texas, containing five Homeowners Associations, one of which is PHOA which includes over 2,250 houses.[4]

15. Providence Village has several unofficial social media groups that often contain explicitly racist and threatening posts.  PHOA Board members belong to and actively engage with content in these groups.

16. From 2018 through 2022, the number and concentration of Black residents in Providence Village was increasing.  As of 2022, households were 74% White and 14% Black.

17. Around July 2021, following an altercation between a Black teenager and a White teenager, residents began blaming voucher-holders for crime and other problems in Providence Village, often using racial language, such as "ghetto."

18. At the time, only 4% of households in Providence Village used Housing Choice Vouchers.  Ninety-three percent of voucher-households in Providence Village are Black.

19. Over the next few months, Mr. Watson and the Board worked together to draft the Rental and Leasing Rules (the "Rules").  The Rules prohibited owners from renting to HCV tenants, and imposed other restrictions on rental housing, such as allowing only one rental per property owner.  Mr. Watson and the Board acted despite initially being told by the mayor and others that such restrictions might violate fair housing laws.

20. The Board's governing documents did not give it the authority to directly enact the Rules; rather a vote by a majority of property owners was needed.  On November 30, 2021, Ms. Dautrich proposed amending PHOA's governing documents to give the Board the authority "to adopt rules for the rental, leasing, and tenant occupancy" (the "Amendment") instead of conducting a vote on the Rules themselves.

21. In support of the Rules, Ms. Dautrich discussed property maintenance and crime in the general area, but she did not support her conclusions with any data.  Respondents have since claimed that the Rules were necessary to address crime, maintenance issues, and property values, but Respondents had no comprehensive sources of information showing these to be real problems – let alone problems caused by voucher-holders – when they began pursuing the Rules, nor have they acquired such information to date.

22. Voting for the Amendment opened on February 7, 2022.  The Board planned to hold the vote open until enough votes were received for the Amendment to pass, which they had not done for prior amendments.

---

[4] From this point forward, "Providence Village" and the "Town" are used to refer to the portion that belongs to PHOA.

4

Exhibit 1 - page 18

23. In response to dozens of emails, on February 15, 2022, FirstService included a "Q&A" about the Amendment and a link to the draft Rules in its weekly email newsletter. The Q&A made clear that "No lease, Section 8 or otherwise, will be terminated immediately." FirstService included the full Q&A in its newsletter at least a dozen more times.

24. Landlords with HCV tenants reached out to the Board to ask that if crime or maintenance issues were truly the concern the Board provide them with additional details so they could address any specific problems. The Board never responded to these requests.

25. While voting was ongoing, posts about voucher-holders in the Town's unofficial social media groups were rampant. For example, one post showed the mug shots and arrest record for a Black man, who the poster presumed was a voucher-holder, with the caption "Damn this ghetto ass neighborhood is on a roll!!! Hide Your kids cause section 8 is on the loose!!!"[5] The post garnered about 100 comments, many of them using extreme language in talking about voucher-holders, such as one referring to the man as a "the dumb ass sec 8 pos" and another referencing "ghetto trashy areas that are full of pos renters and section 8."[6] Ms. Dautrich joined the comments on this post to promote the Amendment.

26. Around April 2022, Ms. Dautrich organized a group of twenty-three homeowners – including another Board member – to form an Amendment Committee, which went door-to-door trying to persuade owners to vote for the Amendment. Mr. Watson and the Board were in contact daily to track how many more votes were needed, who voted, how they voted, and which houses the Committee should target next.

27. The Board and FirstService inundated owners with automated email reminders, the frequency of which Mr. Watson increased to daily. Board and Committee members also promoted the Rules heavily on social media.

28. No prior amendment efforts prompted the formation of a special committee, a coordinated canvassing campaign, or this level of promotion by FirstService or the Board.

29. In May 2022, the Amendment received enough votes to pass, so Mr. Watson closed online voting. On June 1, 2022, in a special open meeting the Board provided owners one last chance to vote even though they knew that the Amendment had already passed.

30. On June 6, 2022, in another open meeting, the Board voted unanimously to approve a revised version of the Rules, and on June 14, 2022 they were finalized and recorded. Despite earlier pledges not to displace residents immediately, the Rules as enacted did not preclude this. The Board announced that enforcement would begin in ninety days, and Mr. Watson told some residents it would begin in as little as thirty days.

31. Although the Board later said that current residents could finish their lease terms up to twelve months, landlords had already started telling HCV tenants that they had to move immediately, leading to frantic searches for alternative housing. In the wake of the Rules' enactment, nineteen voucher-households have moved away from Providence Village, while others who remain continue to live in fear.

---

[5] All online posts appear as written, including original typographical errors.

[6] "Pos" is a slang term meaning piece of sh*t.

5

Exhibit 1 - page 19

32. On June 8, 2022, several residents who opposed the Amendment gathered in a park by a lake to discuss the vote. An Amendment Committee member photographed the group, which included children, and another resident posted the photograph to social media with the caption "Here's a great pic depicting the very Fu*king Idiots that help to Ruin our lovely town of Providence Village!!"

33. Complainant ▮▮▮ reported the incident to Mr. Watson and the Board, explaining the fear it and other social media posts had caused him and his wife. Mr. Watson and the Board had mediated other neighborhood disputes, but the only action they took in response to Mr. ▮▮▮ complaint was to put a reminder in their weekly newsletter about "our communal obligation to each other to uphold community standards."

34. After the Rules' passage, racist posts continued to fill the Town's unofficial social media groups. Sometimes these posts specifically named residents who had opposed the Amendment. These posts also often contained negative stereotypes of Black people and many were threatening. For example, one resident referred to voucher-holders as "wild animals" and "lazy entitled leeching TR@SH," while another post refenced "the hood mentality." Someone else posted an image of a Halloween costume labeled "Providence Village Renter." The label showed a photo of a Black woman, lists a "sassy attitude," "weapons," "a section 8 voucher," and "24 hours to live," and says "PREVIOUS FELONY CONVICTIONS INCLUDED!!!!"

35. On August 5, 2022, PHOA entered into an agreement with HUD staying enforcement of the Rules.

36. On June 18, 2023, Texas passed a state law barring associations from restricting property owners' choice of tenants based on the tenant's source of income, which became effective on September 1, 2023.

37. During the summer and fall of 2023, racial tensions in Providence Village related to voucher-holders continued to build. In July and November 2023, the National Justice Party, a White nationalist organization protested just outside of Providence Village with fliers that said "an overwhelming majority of section 8 recipients are composed of Black Americans" who bring "unimaginable violence."

38. On February 8, 2024, Ms. Dautrich filed state court proceedings on behalf of PHOA against Complainants ▮▮▮▮▮▮▮▮, and ▮▮▮▮ to take their depositions after the Department declined to disclose certain information about these Complainants. The court dismissed this action as meritless and awarded Complainants attorneys' fees. The court also ruled that the PHOA violated the Texas Citizens Participation Act by interfering with Complainants' rights to petition HUD. These proceedings caused Complainants stress and anxiety and led them to fear for their safety, as their home addresses were publicized through the court filings.

39. In February 2024, the Board met with their state representative to discuss alternative ways to get voucher-holders out of Providence Village, which included his suggestion that "Establishing caps on community rental percentage could limit Section 8 growth."

40. On May 10, 2024, the Board adopted the "Second Amended and Restated Rental and Leasing Rules," which limited owners to one rental property each. Because most voucher-holders in Providence Village rented from a few large landlords, this rule would in practice have similar

6

Exhibit 1 - page 20

results as the prior outright ban.  The new rules also limited the number of rental units to twenty-five percent of the lots in Providence Village.

41. From the lead up to the Rules' enactment through its aftermath, residents directed aggressive and threatening posts at voucher-holders. For example, one post said "Back in the day, when a community didnt like someone they banned together to make said persons life a living hell to the point they left."  Another resident threatened "they might just leave in a coroner's wagon!!" and "kids will get SHOT."  Posts like these were also directed at residents who supported voucher-holders and opposed Rules.  For example, one resident posted "I can't wait till one of these Ghetto 8 POS's harm one of the bleeding heart dipsh*ts that supported that failed program!"  Despite being well aware of such conduct, neither the Board nor FirstService ever did anything meaningful to address it.

42. As a result of Respondent's discriminatory conduct, Complainants suffered actual damages, including emotional distress.

### D. Legal Allegations

43. As described above, Respondents PHOA, FirstService, Dautrich, and Watson made dwellings unavailable because of race and color in violation of Subsection 804(a) of the Act. 42 U.S.C. § 3604(a); 24 C.F.R. § 100.50(b)(3).

44. As described above, Respondents PHOA, FirstService, Dautrich, and Watson discriminated in the terms, conditions and privileges of rental of a dwelling, and in the provision of services in connection therewith, because of race and color in violation of Subsection 804(b) of the Act.  42 U.S.C. § 3604(b); 24 C.F.R. § 100.65(a).

45. As described above, Respondents PHOA and Dautrich interfered with the rights of Complainants ███████████████████████████████████████ for engaging in a protected activity under the Act and retaliated against them for their protected activity in violation of Section 818 of the Act.  42 U.S.C. § 3617; 24 C.F.R. § 100.400(b), (c)(5).

46. As described above, Respondents PHOA, FirstService, Dautrich, and Watson failed to take prompt corrective action for the intimidation and harassment of Complainants, in violation of Section 818 of the Act.  42 U.S.C. § 3617; 24 C.F.R. §§ 100.7(a)(1)(iii), 100.400(b), (c)(2), (c)(4).

## III.  CONCLUSION

WHEREFORE, the Secretary of the U.S. Department of Housing and Urban Development, through the Office of the General Counsel, and pursuant to 42 U.S.C. § 3610(g)(2)(A) hereby charges Respondents with engaging in discriminatory housing practices in violation of 42 U.S.C. §§ 3604(a), (b), and 3617 and requests that an Order be issued that:

1. Declares that the discriminatory housing practices of Respondents as set forth above violate the Act, 42 U.S.C. §§ 3604(a), (b), 3617.

2. Enjoins Respondents, their agents, employees, and successors, and all other persons in active concert or participation with them, from discriminating because of race or color against any person in the sale or rental of a dwelling;

Exhibit 1 - page 21

3. Enjoins Respondents, their agents, employees, and successors, and all persons in active concert or participation with them, from coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, any right granted or protected by the Act;

4. Mandates that Respondents, their agents, employees, officers, and successors, and all other persons in active concert or participation with them, take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

5. Awards such actual damages as will fully compensate Complainants and any other aggrieved persons for any and all injuries caused by Respondents' discriminatory conduct, pursuant to 42 U.S.C. § 3612(g)(3);

6. Assesses the maximum civil penalty against Respondents for each discriminatory housing practice, pursuant to 42 U.S.C. § 3612(g)(3) and 24 C.F.R. § 180.671(a)(1); and

7. Awards such additional relief as may be appropriate under 42 U.S.C. § 3612(g)(3).


Date:   January 14, 2025                 Respectfully submitted,

*Jeanine Worden*
135B5905C9CB4DB...
JEANINE M. WORDEN
Associate General Counsel for Fair Housing

*Ayelet Weiss*
659E42E8782D49E...
AYELET R. WEISS
Assistant General Counsel for Fair Housing Enforcement
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh Street, SW, Room 10249
Washington DC 20410
Ayelet R.Weiss@hud.gov

*Allyssa Wheaton-Rodriguez*
EB51E8A0DFB54CD...
ALLYSSA WHEATON RODRIGUEZ
Associate Regional Counsel of Litigation
U.S. Department of Housing and Urban Development
Region VI
307 W. 7th Street
Suite 1000
Fort Worth, TX 76102
Office: (817)-978-5994
Allyssa.D.WheatonRodriguez@hud.gov

Exhibit 1 - page 22

Docusign Envelope ID: 490E4E68-5EF5-4DFE-B307-976813B65EC9

Signed by:

*Rebecca Coy*

6791758E4BA54A4

DAVID BERMAN
REBECCA COY
JULIA DYKSTRA
PALMER T. HEENAN
Trial Attorneys
U.S. Department of Housing and Urban Development
Office of General Counsel
451 7th Street SW, Room 10249
Washington, DC 20410
David.M.Berman@hud.gov
Rebecca.M.Coy@hud.gov
Julia.Dykstra@hud.gov
Palmer.T.Heenan@hud.gov

DocuSigned by:

*Kimberly Quirk*

54AF7D0FC5214E9...

KATHRYN PRICE
KIMBERLY QUIRK
Trial Attorneys
U.S. Department of Housing and Urban Development
Region VI
307 W. 7th Street
Suite 1000
Fort Worth, TX 76102
Office: (817)-978-5994
Kathryn.E.Price@hud.gov
Kimberly.A.Quirk@hud.gov

9

Exhibit 1 - page 23

## DETERMINATION OF REASONABLE CAUSE AND NO REASONABLE CAUSE

**Case Name:**  ▮▮▮▮▮▮▮▮ , et al. v. Providence Homeowners Association, Inc., et al.

**Case Numbers:** 06-22-4391-8, 06-22-4448-8, 06-22-4452-8, 06-22-4488-8, 06-22-4489-8, 06-22-4492-8, 06-22-4494-8, 06-22-4495-8, 06-22-4504-8, 06-22-4505-8, 06-22-4506-8, 06-22-4507-8, 06-22-4508-8, 06-22-4524-8, 06-22-4543-8,  06-22-4583-8, 06-22-4627-8, 06-22-4628-8, 06-22-4630-8, 06-22-4631-8, 06-22-4647-8, 06-22-4648-8, 06-22-4663-8, 06-22-4668-8, 06-22-4669-8, 06-22-4746-8, 06-22-4768-8, 06-22-4784-8, 06-22-4786-8, 06-22-4787-8, 06-22-4805-8, 06-22-4809-8, 06-22-4810-8, 06-22-4827-8, 06-22-4848-8, 06-22-4849-8, 06-22-4912-8, 06-22-4927-8, 06-22-4967-8, 06-22-4991-8, 06-22-5007-8, 06-22-5090-8, 06-22-5127-8, 06-22-5149-8, 06-22-5149-8, 06-22-5153-8, 06-23-5670-8, 06-23-5756-8, 06-23-6137-8, 06-23-6311-8, 06-23-6350-8, 06-23-6365-8, and 06-23-6388-8

### I.  Jurisdiction

Between June 24, 2022 and June 3, 2023, Complainants filed timely complaints with the Department of Housing and Urban Development ("HUD") alleging that Providence Homeowners Association Inc. ("PHOA") and its property management company, FirstService Residential Texas, Inc. ("FirstService"), discriminated because of race, color, sex, national origin, familial status, and disability in violation of the Fair Housing Act ("Act") through the enactment of rental rules that prohibited, inter alia, homeowners from renting to tenants who receive assistance through the Housing Choice Voucher ("HCV") Program.[1]  Several Complainants also named Jennifer Dautrich, the president of the PHOA, and Cody Watson, the property manager employed by FirstService, as respondents.  Between September 13, 2023, and November 8, 2023, the complaints were amended to ensure that all proper respondents, factual allegations, and protected classes were included in each complaint and to revise the date of the last act of discrimination.

Subsection 804(a) of the Act prohibits making a dwelling unavailable to any person because of race, national origin, color, familial status, or sex, and Subsection 804(f)(1) does so because of disability.  Subsection 804(b) of the Act prohibits discrimination against any person in the terms, conditions, or privileges of the rental of a dwelling, or in the provision of services or facilities in connection with the rental of a dwelling, because of race, color, national origin, familial status, disability, and sex, and Subsection 804(f)(2) does so for disability. Section 818 of the Act makes it unlawful to intimidate, threaten, or interfere with any person in the exercise or enjoyment of – or on account of having exercised or enjoyed – any right granted or protected by other provisions of the Act, or on account of having aided another in doing such.

### II.  Parties

#### A.  Complainants

Forty Complainants (belonging to thirty-six households) are tenants who receive Housing Choice Vouchers ("HCVs") and reside in Providence Village, or did so at the time of the events discussed in this Determination.  Those Complainants are ▮▮▮▮▮▮▮▮▮▮▮▮ ,

---

[1] The HCV program was formerly called the Section 8 program, and is still often referred to by that name.  It includes the Mainstream Vouchers and Veterans Affairs Supportive Housing Vouchers, among others. *See HCV Programs and Initiatives*, HUD, https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/programs_and_initiatives (last visited Jan. 6, 2025).

1

Exhibit 1 - page 24



[3] All of these Complainants except ████████████████████████ are Black.

Eleven Complainants own properties in Providence Village and rent to tenants receiving HCVs. Those Complainants are ████████████████████████████████████████████████████████████████████████████████████

Two Complainants are Housing Authorities that administer HCVs in Providence Village. Those Complainants are the McKinney Housing Authority and the Denton Housing Authority.

Four Complainants are residents of Providence Village who opposed the actions described in this Determination and the loss of the important benefits from living in a racially integrated community that they allege these actions will cause. These Complainants are ████ ████████████████████████████████████████████. ████████ and ████████ are Black. ████████ and ████████ are White.

In addition to the Complainants listed in this section, at least twelve additional adult household members and seventy-eight minor children of Complainants are also aggrieved persons under the Act.

### B.   Respondents

Respondent PHOA is a homeowners' association for a neighborhood in Providence Village, Texas and a non-profit corporation, incorporated under Texas law on June 12, 2002.

Respondent Jennifer Dautrich has been the president of PHOA since April 7, 2022, before which she was its Vice President.

Respondent FirstService provides property management services to PHOA.

Respondent Cody Watson is a FirstService employee who was the property manager for PHOA from 2009 until December 31, 2022, when he advanced into another position at FirstService.

## III.   Complainants' Allegations

Complainants allege that Respondents twice enacted rules preventing members of the Providence Village Homeowners Association from renting to voucher-holders if the property owner so chooses, which they otherwise would be entitled to do. Complainants allege that Respondents enacted these rules with the purpose of excluding residents because of their race,

---

[2] This Complainant filed her initial Complaint using the name ████████████, but later informed HUD that she now uses the last name "████████."

[3] Five Complainants are subject to protective orders under the Violence Against Women Act. *See* 34 U.S.C. §§ 12291-12514. For that reason, this Determination identifies them by their initials rather than their full names.

Exhibit 1 - page 25

national origin, color, familial status, disability, and sex.

## IV.    Respondents' Defenses

Respondents deny that they discriminated against Complainants because of race, color, national origin, familial status, disability, or sex.  Respondents allege that the rules they enacted were intended to promote well-maintained homes, stabilize property values, and address community concerns regarding crime. Respondent FirstService also asserts that it is not responsible for the actions of Respondent PHOA.

## V.    Factual Findings

### A.    Background

The Town of Providence Village is an outer-ring suburb of Dallas, Texas, containing five Homeowners Associations, one of which is PHOA.[4]  The area that belongs to PHOA includes over 2,250 houses, and it contracts with FirstService for property management services.  As of 2022, its households were 74% White and 14% Black, its households were 66% owners and 34% renters, and 4% of households used Housing Choice Vouchers.[5]

PHOA is run by a Board of Directors in accordance with three governing documents: the Articles of Incorporation, the Bylaws of Providence Homeowners Association, Inc., and the Declaration of Covenants, Conditions, & Restrictions ("Declaration").  Jennifer Dautrich became PHOA Board President on April 7, 2022.  She had been an active Board member since 2019, serving first as Treasurer and then Vice President.

The events discussed below occurred against a backdrop of escalating tensions in Providence Village that largely played out in several unofficial social media groups for the Town.[6]  Though the groups were unofficial, many Board members belonged to them and actively engaged with their content.[7]  These groups often contained explicitly racist and threatening posts.  For example, one post included a photo of a Black man altered to have a rope around his neck, with the caption "This one is not coming back tomorrow."  In another post, someone wrote "Borrow a paintball gun.  Light them asses up with a florescent yellow paint ball.  It would contrast nice with their dark skin."  In one thread, someone posted the mug shot of a Hispanic

---

[4] From this point forward, "Providence Village" and the "Town" are used to refer to the portion that belongs to PHOA.

[5] Throughout this document, the race of a household refers to the race of the "head of household."  "White" refers to those identifying as "White alone" and "Black" refers to those identifying as "Black or African American alone." Data regarding the demographics of voucher-holders come from HUD's Picture of Subsidized Housing.  HUD OFFICE OF POLICY DEV. & RESEARCH, PICTURE OF SUBSIDIZED HOUSEHOLDS, www.huduser.gov/portal/datasets/assthsg.html#2009-2023_data (Census Tract: MO - WY tables) (last visited Jan. 8, 2025).  All other demographic data, unless noted otherwise, come from the American Community Survey.  *Explore Census Data*, U.S. CENSUS BUREAU, https://data.census.gov/ (Tables S2502 and DP02) (last visited Jan. 8, 2025). Demographic data was drawn from Census Tracts 201.21 and 201.22 in Texas, covering the Town.

[6] These include the following Facebook groups: Providence Village Water Cooler (Rarely Censored), TMZ Live of Providence Village UnCensored!!, Providence Village: The Good, The Bad & The Ugly, Providence Village: The Good, The Bad & The Ugly [Private Group for Residents], Unofficial PHOA Water Cooler, Providence Village Neighborhood Watch, The Real Housewives of Providence Village, The Unofficial Official Providence Village Water Cooler.  They also include the neighborhood NextDoor group.  Some members of these groups joined and posted using profiles with fake names, making it difficult to tell the true author of certain posts.  For all but one of these groups, the Department has been able to confirm that Board members belonged to them.

[7] All online posts appear as written, including original typographical errors.

3

Exhibit 1 - page 26

woman with the caption "Another classy citizen of Providence Village!" to which someone else replied "wouldn't be opposed to holding the 'shower' doors open and helping load trains."

    B.    <u>Lead up to the Enactment of the Rules</u>

Around 2018, the PHOA Board of Directors began discussing their perception that the number of rental units in their community was growing and that this was causing problems. Although the number of rental units was not, in fact, increasing, homeowners expressed concerns that an increase in rental properties was causing properties to be poorly maintained. The homeowners feared a decrease in property values and an increase in crime. What was, in fact, increasing in the Town during this time was the number and concentration of Black residents.[8]

Around July 2021, Board members and other homeowners in the Town began focusing their concerns specifically on renters using Housing Choice Vouchers, even though voucher-holders continued to comprise an extremely small percentage of the neighborhood's population.[9] This shift in focus followed an altercation at the community basketball court between two teenage boys – one Black and the other White – that lead to the arrest of the Black teenager. In the wake of this incident, many homeowners assumed the Black teenager belonged to a voucher-family and cited this incident as proof that renting to voucher-holders should be stopped. Ninety-three percent of voucher-households in PHOA are Black; by comparison 14% of all households in PHOA's neighborhood are Black. Around this time, PHOA hired a private security company to patrol common areas of the neighborhood. PHOA later followed up by installing security cameras at the basketball court and in other recreational areas with signs indicating that the areas were under video surveillance.

Throughout this period, the Town's unofficial social media groups started to become filled with posts blaming voucher-holders for crime and other problems using racial language, such as "ghetto."[10] For example, someone posted "You ever thought maybe some of us don't want to live amongst ghetto poverty crime ridden mentality people? … we get nervous because your type of ghetto minded folks bring the crime level up and make it a dangerous neighborhood." Board members also blamed voucher-holders for crime in social media posts. For example, one Board member wrote "it's called Section 8," then later continued, "It seems like the neighborhood is plagued with convicts, GET OUT!!!"

By the fall of 2021, these conversations about perceived changes in the community began to also include calls from homeowners for the Board to restrict the ability of owners in the Town to rent their properties to voucher-holders. In response, a discussion broke out on social media among the Town's residents and officials about the legality of this approach. The mayor pointed out that a homeowners association in Savannah, a nearby neighborhood also managed by FirstService, attempted something similar and was "sued 9 times and lost each one" because

---

[8] From 2018 to 2022, White owners decreased from 92% to 77%, while Black owners increased from 3% to 8%. White renters decreased from 87% to 76% while Black renters increased from 9% to 16%.

[9] From 2017 to 2023, the concentration of voucher-holders in the neighborhood vacillated between 2% and 5%, and the number of voucher-households increased roughly in proportion with an increase in the number of households in the neighborhood generally.

[10] "The Fifth Circuit has recognized that the term 'ghetto' has innate racial overtones." *Garza v. Ranier L.L.C.*, No. A–12–CV–475–AWA, 2013 WL 3967786, at *4 (W.D. Tex. July 31, 2013) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007)); *see also Smith v. Farview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).

Exhibit 1 - page 27

"Fair housing makes it illegal to restrict." Ms. Dautrich confirmed that the Board has "had meetings with our legal team regarding Section 8 and there is nothing we can do." As the discussion continued over several weeks, Ms. Dautrich added "For some reason our zip code has become a hub for section 8" and in her view "only so many should be allowed in any neighborhood."[11] She reiterated that "the PHOA board has met with the lawyers" and "there is nothing we can do," but added "I still fight it."

Around this time, the Board began working with PHOA's property manager, Cody Watson, on steps they could take to limit voucher-holders in their neighborhood. At the time, Mr. Watson advised the Board that he thought such actions would be unlawful and that his manager at FirstService agreed. Ms. Dautrich, however, appealed to someone higher up at FirstService, and after that Mr. Watson continued to assist the Board with their efforts. On October 29, 2021, Ms. Dautrich posted on social media that she spoke to officials in Savannah and that the Board had "been fed misinformation" but will meet in a few weeks to discuss.

Residents of the Town provided their views to the Board on these efforts, often by tagging them in posts on social media. For example, one owner tagged Ms. Dautrich in a post that said "I think the main things is just to be careful how you word it in the bylaws … it can't come off as being discrimination against protected classes (race, sex, etc). It's usually easier to put bylaws with restrictions on rentals (number allowed per investor, total % of the neighborhood, etc) which then results in fewer section 8 types/fewer rentals overall."

C.    Enactment of the Rules

Over the next few months, Mr. Watson and the Board worked together to draft the Rental and Leasing Rules (the "Rules"), which contained about a dozen restrictions on rental housing. The Rules were based on those from Savannah, and Mr. Watson exchanged over ten drafts with the Board during this process.[12] Mr. Watson flagged that restrictions on voucher-holders would be a challenge to enforce because PHOA and FirstService did not track rentals, let alone which tenants used vouchers, but the Board dismissed these concerns and vaguely discussed hiring additional staff.

The Rules provided that no rental home could be publicly financed or subsidized.[13] They also prohibited short term rentals, limited owners to one rental property, and required owners live in the home for a period of time before renting it out. The Rules stated that owners could be charged hundreds of dollars per week for failing to comply with these rules.

At the time, the Board's governing documents did not give it the authority to directly enact rental restrictions. Instead, a majority of property owners would have needed to vote in favor of adding such restrictions to the Declaration for them to take effect. The Board had attempted to amend the Declaration by majority vote many times in the past; some of these attempts had succeeded while others had failed.

The Board, however, chose not to put the Rules to the property owners for a majority vote. Rather, the Board opted to have the property owners vote on whether to amend the

---

[11] Statements about a city "becoming a dumping ground" for HCV tenants and being at "war" with them have been considered evidence of discriminatory intent. *Cmty. Action League v. City of Palmdale*, No. CV 11–4817 ODW (VBKx), 2012 WL 10647285, at *6-7 (C.D. Cal. Feb. 1, 2012).

[12] Mr. Watson later shared the Rules with other FirstService-managed communities looking to do something similar.

[13] This Rule is entitled "Section 8 Housing Restriction," but it bans all forms of government assistance.

5

Exhibit 1 - page 28

Declaration to give the Board authority to implement such restrictions on their own.  By doing it this way the Board would not be required to solicit community input or approval on the text or details of the restrictions.  As Mr. Watson later explained at a community meeting, the Board felt these restrictions would be "hard enough to get passed" without that additional hurdle.

Accordingly, at a Board meeting on November 30, 2021, Ms. Dautrich proposed adding Section 2.14 to the Declaration authorizing the Board "to adopt rules for the rental, leasing, and tenant occupancy of the Lots within the Subdivision."  No other section in Article II of the Declaration is phrased this way; rather, the other provisions lay out the text of the rules themselves.[14]  In support of her proposal, Ms. Dautrich discussed property maintenance and crime in the general area, but she did not provide data that was specific to PHOA or that connected any such issues to voucher-holders, nor was such data presented at any of the Board's meetings in the months that followed.  As another Board member wrote on social media a few months later "no I don't have statistics, I use my common sense and what I have seen transpire in the neighborhood."

Voting for the Amendment opened on February 7, 2022, with 1127 votes needed for the Amendment to pass.  Property owners could vote online, by mail, by fax, by email, or by dropping off their ballot at the community clubhouse, and owners were allowed to change their votes after they were initially cast.  The Board planned to hold the vote open until enough votes were received for the Amendment to pass.[15]  The Board had not done this for prior amendments, some of which failed because too few votes were cast to reach a majority.

Over the following week, dozens of residents emailed the Board about the Amendment, including many who had questions about what rules specifically the Board wanted the authority to enact.  One asked if owners would get to see the text of the actual rules "like previous voting cycles have done."

In response to these inquiries, on February 15, 2022, FirstService featured the proposed Amendment in the weekly email newsletter that it sends out to PHOA residents.  The newsletter included a "Q&A" about the Amendment and a link to a draft of the rules that the Board wanted to enact if given the authority.[16]  The Q&A highlighted that "the rules would prohibit any future Section 8 leases" but made clear that "No lease, Section 8 or otherwise, will be terminated immediately.  All current leases will be honored without penalty."  The full Q&A were included at least a dozen more times in FirstService's weekly newsletter.

In the weeks that followed, landlords with rental properties in Providence Village – including Complainant ███████ – reached out to the Board objecting to the ban on voucher-tenants and the other proposed rental rules.  The landlords asked that if crime or maintenance issues were truly the concern the Board provide them with additional details so they could address any specific problems.  The Board never responded to these requests.

While voting was ongoing, posts about voucher-holders in the Town's unofficial social

---

[14] Provisions in another section of the Declaration give the Board authority to enact rules, but those provisions pertain to common-use property which is owned, leased, or controlled by PHOA rather than the property of private owners, and those provisions had been a part of the Declaration since its inception.

[15] The online voting platform listed a close date of December 31, 2022, but the Board acknowledged at the time that this was merely a placeholder required by the online system that they could change later if they needed more time.

[16] The newsletter noted that the draft had been "approved by … the Board" but was "subject to change."

6

Exhibit 1 - page 29

media groups were rampant.  For example, one post showed the mug shots and arrest record for a Black man, who the poster presumed was a voucher-holder,[17] with the caption "Damn this ghetto ass neighborhood is on a roll!!!  Hide Your kids cause section 8 is on the loose!!!"  The post garnered about 100 comments, many of them using extreme language in talking about voucher-holders, such as one referring to the man as a "dumb ass sec 8 pos" and another referencing "ghetto trashy areas that are full of pos renters and section 8 where they stuff 7/11s."[18]  Ms. Dautrich joined the comments on this post to promote the Amendment.  She wrote "with all of these old charges he shouldn't be allowed to participate in the govt housing assistance program….  How many people still need to vote on the amendment?"  Minutes later she continued "we don't have anything in place about renters in our HOA….  Again, people need to vote yes."  Echoing this message, a homeowner replied, "I hope this is enough to push everyone to vote Yes!!!"

By April 2022, it had become clear that not enough owners were voting to reach a majority, so Ms. Dautrich organized a group of twenty-three homeowners – including a current and a former PHOA Board member – to form an Amendment Committee.[19]  Board members and Committee members actively campaigned for the Amendment by going door-to-door collecting ballots and trying to persuade owners to vote for the Amendment.  Mr. Watson and the Board were in contact daily to track how many more votes were needed, who voted, how they voted, and which houses the Board and the Committee should target next.  Mr. Watson asked the voting system administrator for reports every morning "of who has voted and how they have voted," noting that he needs "constant updates so we don't go to homes who have already voted."  During this campaign, confusion about the vote persisted, including among Board and Committee members, causing many residents to believe they were voting on the draft rules, rather than only on the Amendment.

Throughout this time, FirstService and the Board arranged for owners to be inundated with reminders about the Amendment.  Property owners received automated reminders by email multiple times per week, and in early May, Mr. Watson increased their frequency to daily.  He also provided the voting system administrator more email addresses to send them to.  FirstService included information about the vote in every issue of its weekly email newsletter, while the Board and the Amendment Committee promoted the Amendment heavily on social media.  No prior amendment efforts, even those that failed to gain traction, prompted the formation of a special committee, a coordinated canvassing campaign, or this level of promotion by FirstService or the Board.

By May 2022, these efforts had paid off and the Amendment had nearly enough votes to pass.  On May 18, 2022, the Board announced that owners' last chance to vote on the Amendment would be at a special open Board meeting two weeks later.  In the meantime, however, the Amendment received enough votes to pass, so Mr. Watson closed voting in the online system.

On June 1, 2022, the Board held its special open meeting, which was well attended by the

---

[17] The Department has been unable to find any evidence that this man was, in fact, a voucher-holder.

[18] "Pos" is a slang term meaning piece of sh*t.

[19] PHOA's Bylaws permit the Board to appoint committees to perform tasks as the Board deems appropriate.  Most committees that the Board appointed are formally created by a Board vote and even have a point of contact listed on PHOA's website.  No such formalities were observed for the creation of the Amendment Committee.

Exhibit 1 - page 30

community.  FirstService brought staff from nearby properties to count paper ballots submitted at the meeting, and police and private security attended due to the heated rhetoric.  Even though the Board knew the Amendment had already received enough votes to pass, this was not announced at the start of the meeting.  Rather, Mr. Watson spoke about the importance of the Amendment and announced that "now is the time to go ahead and vote" for anyone who had not done so already.  Ms. Dautrich and Mr. Watson took questions while ballots were counted and then finally announced that the Amendment had passed.

On June 6, 2022, the Board held another open meeting.  Ms. Dautrich read out a revised version of the Rules, which the Board then voted unanimously to approve using its new authority.  Unlike at the prior meeting, no questions or input from the community were taken.  Two days later, the Board sent out a letter to all owners announcing the Rules and explaining that "[c]ollectively they are intended to protect our property values by preserving the natural beauty of our neighborhood, promoting a sense of harmony between neighbors and maintain an aesthetically pleasing appearance overall."

On June 8, 2022, several residents who opposed the Amendment – including Complainants ▇▇▇▇▇▇▇▇ – gathered in a park by a lake to discuss the vote.  An Amendment Committee member photographed the group, which included children, without their knowledge and another resident posted the photograph to social media with the caption "Here's a great pic depicting the very Fu*king Idiots that help to Ruin our lovely town of Providence Village!!"  The next day, ▇▇▇▇▇ emailed Mr. Watson about this incident and others in which he and his wife, Heather Wilhite, were targeted for opposing the Amendment.  Mr. Watson replied apologetically and agreed to meet but noted "I really am not sure how to address that for you from an HOA perspective."  A few weeks later, ▇▇▇▇▇ wrote Mr. Watson again reiterating his concerns and asking that the photographer be removed from a PHOA committee.  Mr. Watson forwarded this request to the Board, but no further actions were taken.  ▇▇▇▇▇ also reported this and other incidents to Mr. Watson and asked that the photographer be removed from her Board committee, but he responded by dismissing the severity of what had occurred.

On June 14, 2022, the Rules were finalized and officially recorded.[20]  The following day, the Board sent a letter to all owners notifying them that enforcement of the Rules would begin in ninety days, though Mr. Watson suggested in emails to some owners that enforcement could begin in as little as thirty days.  About a week later, the first Complaint was filed with HUD.

Around the time that the Rules were enacted, two additional incidents of criminal activity occurred in Providence Village – a drive-by shooting and a fire at a playground – that spurred a flood of activity in the Town's unofficial social media groups.  Many residents presumed the perpetrators were voucher-holders,[21] with posts such as "All those Section 8 renters.  The HOA recently banned all that riff raff from living there.  Too much crime."  A Savannah resident posted congratulations on the Rules and then said "You absolutely do not want Providence Village to become a hybrid Federal Housing Project … In the end … the drive by shooting culture loses"; one Board member and two Amendment Committee members responded with

---

[20] The Rules as recorded on June 14th differed slightly from the version as enacted on June 6th, in that they required landlords to provide PHOA with contact information and start dates for each tenant rather than full leases.

[21] The identities of the children responsible for the fire were never released.  Ms. Dautrich asserted on social media that the perpetrator of the drive-by shooting lived "in an investor owned home," but she never confirmed this detail, let alone that he rented using a voucher.

8

Exhibit 1 - page 31

positive emoji while another Board member forwarded the post to the full Board and suggested they meet with the poster because he "could be invaluable to us!"  Some posts also included stereotypes, such as "This playground fire is definitely a group of section 8 kids …  Watch Ya'lls backs those section 8 folks have huge groups of families, take a mommy with 8 kids, that's 8 baby daddy's, … totaling 96 relatives who may be willing to come to PV to stir the pot, riot or start a fire."[22]  One post noted "Seems to be a common occurrence and a common demographic."

     D.       Aftermath of the Enactment of the Rules

The enacted Rules set off an immediate wave of panic among owners and tenants.  Immediately, owners told their HCV tenants that to avoid substantial fines levied by PHOA, tenants had to vacate their units within thirty days, leading to frantic searches for alternative housing.[23]  Mr. Watson, pointed out to the Board again that enforcement would be difficult without additional staff, which the Board had still not hired.[24]

Many owners were particularly upset because they expected the final version of the Rules to "grandfather in" existing rental properties or tenants because of language along these lines in the Q&A that the Board had repeatedly circulated.  As one owner put it, "Many home owners casted their votes based on the information in you Q&A," while another described the enacted Rules as "so much worse than most of us ever imagined."  Mr. Watson responded to these concerns by making exceptions or delaying enforcement for some of the rules, but he refused to do so for the voucher-holder rule.  He also made clear that the Q&A, unlike the Rules, had no legal effect and therefore could not be relied on.

Concerns were also raised about the motivation for the Rules.  For example, a resident wrote on Reddit that they voted no on the Rules "mainly because [they] think the motive is mostly racism."  A post on another site said "There are thousands of post, messages, etc that prove … its NOT about section 8 but it was done because of their race and because we live in a world of many people who wish segregation would have NEVER ENDED."  Likewise, Mr. Watson forwarded the Board a submission to PHOA's online portal the day after the Rules were finalized that said simply "Y'all racist, right?"

On June 30, 2022, the Board announced that current voucher-holders could remain until their leases expired, not to exceed twelve months, at which point they would need to vacate.[25]  Then, on August 5, 2022, PHOA entered into an agreement with HUD staying enforcement of

---

[22] Statements about excessively large families can be discriminatory racial stereotypes.  *See Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 608-09 (2d Cir. 2016).

[23] The Rules also affected pending sales with Mr. Watson telling one seller to instruct the buyer to request a variance from the rule requiring homes to be owner-occupied when first purchased.  In addition, the Rules effectively precluded any resident of Providence Village from having a mortgage insured by the Federal Housing Administration ("FHA") because such restrictions are not allowed in FHA programs.  In May 2023, a resident made the Board aware of this implication, which the Department later confirmed.

[24] A year after the Rules' enactment, PHOA still had not hired additional staff, though eventually they would bring on one additional full-time FirstService employee and make another current part-time employee full-time.

[25] The reason for this change was supposedly that the Board just learned that there were voucher-holders from two Housing Authorities living in Providence Village.  The letter also said that month-to-month tenants could remain for a few more months, but that allowance is irrelevant as the HCV program does not allow month-to-month tenancies.

9

Exhibit 1 - page 32

the Rules ("Stay").[26]  However, voucher-tenants began leaving their homes due to the uncertainty around this time.  In the wake of the Rules' passage, at least nineteen voucher-households have moved away from Providence Village, while others who remain continue to live in fear.

On August 28, 2022, Mr. ▓▓▓▓ followed up with Mr. Watson, pointing to the Stay and noting that nothing had been done in response to his harassment complaint.  Mr. Watson consulted with Ms. Dautrich, who directed him to request additional information, which ▓▓ ▓▓▓▓ immediately provided by emailing the Board and Mr. Watson details and screenshots. ▓▓▓ ▓▓▓ also highlighted in his email that "[t]hese actions led directly to us being targeted and further harassed" to the point that Ms. Wilhite "does not even feel safe walking our child through the neighborhood."  In response, Mr. Watson noted that the Board put a reminder in its weekly newsletter of "our communal obligation to each other to uphold community standards," but neither the Board nor Mr. Watson took further action in response to Mr. Puffer's complaint.

Over the year that followed the Rules' passage, heated posts about voucher-holders in Providence Village continued to fill the Town's unofficial social media groups, sometimes specifically naming residents who had opposed the Amendment, including Complainants ▓▓▓ and ▓▓▓▓.  These posts also often contained negative stereotypes of Black people and many were threatening.  For example, one resident referred to voucher-holders as "wild animals" and "lazy entitled leeching TR@SH," while another post refenced "the hood mentality."  An Amendment Committee Member wrote that "those getting the free ride off our hard earned tax dollars can't seem to pay rent" and called for residents to try to get vouchers revoked.[27]  Just a few months after the Rules were passed, someone else posted an image of Halloween costume labeled "Providence Village Renter."  The label showed a photo of a Black woman, lists a "sassy attitude," "weapons," "a section 8 voucher," and "24 hours to live," and says "PREVIOUS FELONY CONVICTIONS INCLUDED!!!!"[28]  A different Amendment Committee member was among the many residents to respond to this post with a laughing emoji.

E.    Texas Outlaws the Rules and the Board Tries Again

On June 18, 2023, one year after Providence Village enacted the Rules, Texas passed a state law barring associations from restricting property owners' choice of tenants based on the tenant's source of income.  The law became effective on September 1, 2023.  In response to the new law, the Board sent out a letter stating that they "will continue to fight for you by searching for alternative ways to ensure the integrity of our neighborhood."  Ms. Dautrich reiterated on social media "we didn't lose.… The board is continuing to fight this."

During the summer and fall of 2023, racial tensions in Providence Village related to voucher-holders continued to build.  In July and November, the National Justice Party, a White nationalist organization protested just outside Providence Village with fliers that said "an overwhelming majority of section 8 recipients are composed of Black Americans" who bring "unimaginable violence."  In July they also left flyers at people's homes that said, "The federal

---

[26] Despite the Stay, in December 2022 Mr. Watson instructed another First Service employee to add an address that had "been identified as a rental property … to the list and start the violation process."  The employee replied that he found the address on an affordable housing website, adding that he thinks "it might be good to set a weekly reminder to check this site for any new properties listed."

[27] References to "people who get something for nothing" can be discriminatory racial stereotypes.  *Atkins v. Robinson*, 545 F. Supp. 852, 874 (E.D. Va. 1982).

[28] One Complainant felt so threatened by this post that it contributed to her decision to move.

10

Exhibit 1 - page 33

government views safe White communities as a problem. The Section 8 Housing Voucher is a tool used to bring diversity to these neighborhoods…. Blacks bring crime and violence," and in November they left doorhangers that listed violent crimes supposedly committed by a Black "Section 8" renters. The Board put out a statement that it had "no affiliation with this protest" and "does not condone or support any actions by any type of hate group."[29]

By the winter of 2024, the Department's investigation had progressed, and Respondents requested certain information about five Complainants that the Department declined to disclose. In response, on February 8, 2024, Ms. Dautrich filed state court proceedings on behalf of PHOA against these Complainants to take their depositions even though no Determination had yet been issued by the Department in this matter.[30] The court dismissed the petition as meritless and awarded attorneys' fees.[31] The court also ruled that by filing the lawsuit PHOA violated the Texas Citizens Participation Act by interfering with Complainants' right to petition HUD. Being served at home and having to defend these actions caused Complainants stress and anxiety and lead them to fear for their safety, as their home addresses were publicized through the court filings.

Around the same time as the state court filings, the Board began discussing alternative ways they could get voucher-holders out of Providence Village despite the new state law. In February 2024, the Board met with their state representative to discuss his ideas since he was in the process of forming a task force about the matter. The representative's presentation notes, among several suggestions, that "Establishing caps on community rental percentage could limit Section 8 growth."

Residents who opposed the Rules continued to raise concerns of discrimination to the Board during this time. For example, █████████ tagged Ms. Dautrich and wrote "You spearheaded the movement to kick out section 8 residents based on the fears listed. Now that you're aware that most section 8 residents are actually black single mothers, do you still believe they should be removed from our community siting concerns that they're all criminals?"

On May 10, 2024, the Board adopted the "Second Amended and Restated Rental and Leasing Rules." These updated Rules omitted the now unlawful restriction on renting to voucher-holders but retained the limit of one rental property per owner. Because most voucher-holders in Providence Village rented from a few large landlords – including one whose mission is to provide affordable housing – the one-rental-per-owner rule would in practice have a similar result as the prior outright ban.[32] The Board also included a new rule limiting the number of rental units to twenty-five percent of the lots in Providence Village, as their state representative had suggested.

F.    Intimidation and Harassment Throughout the Process

From the lead up to the Rules' enactment through its aftermath, posts threatening voucher-holders with racially coded language filled social media. For example, one post said "get your section 8 asses out of town now bitches [explosion emoji] and don't let the door hit

---

[29] The police were called but said there was nothing they could do because the protestors were on public property.

[30] The five were Complainants ███████████████████████████████ .

[31] The court issued a ruling in one case, and the PHOA dropped the others after.

[32] For this reason, the Stay prohibited PHOA from enforcing the one-rental-per-owner rule along with the outright ban. HUD considers the reenacting of this rule to have violated the Stay.

11

Exhibit 1 - page 34

you in your fat ass mouths!!" Another said "Back in the day, when a community didnt like someone they banned together to make said persons life a living hell to the point they left." One resident posted "I think we should casually start dropping off moving boxes at certain houses in the neighborhood." Another resident threatened "they might just leave in a coroner's wagon!!" and "kids will get SHOT."

In addition, voucher-holders who were particularly vocal in opposing the Rules were targeted personally. For example, Complainant ██ ., a Black voucher-holder, provided her story and views to several local news organizations for articles they published around the time the Rules were enacted. In response, someone posted her mugshot from an arrest that occurred before she moved into Providence Village with the details of her arrest and the caption "I wonder if this person looks familiar to the area."[33] A resident then also posted her mugshot with the caption "She's full of sh*t, and also a criminal." A comment on one of the news articles said, "All I know is that the property I just sold use to be the center trading town where they hung all the blacks [shrug emoji] look it up you live right next to it [laughing emoji]."

Residents also directed aggressive and threatening posts at residents who supported voucher-holders and opposed Rules, such as Complainants ████████████. For example, one resident posted "I can't wait till one of these Ghetto 8 POS's harm one of the bleeding heart dipsh*ts that supported that failed program!" Another resident photoshopped an image of ████████ wife, ██████████, who is White and also opposed the Rules, onto posters for "Diary of A Mad Black Woman" and "Orange is the New Black," along with several other images and memes, and circulated them in the Town's unofficial social media groups.

Despite being well aware of these actions and the distress they were causing, neither the Board nor FirstService took any meaningful actions to address them. Board members actively participated in the social media groups in which this content was posted. Several Board members admitted seeing aggressive comments in these groups, and Mr. Watson admitted having multiple discussions with Board members about them. In addition, as described above, ██ ████ emailed Mr. Watson and the Board details of some of these incidents with screenshots, but they declined to do more than put a reminder about community standards in the weekly newsletter.

This inaction stands in contrast to actions that Mr. Watson and the Board took regarding more minor incidents. Mr. Watson mediated many disagreements between residents, such as issues with dogs barking, cars blocking driveways, blocking mailboxes, trespassing, and not mowing lawns, among others. He even called the police in certain instances, for example, in response to complaints of kids fighting. For its part, the Board often worked with Mr. Watson to resolve certain disputes, as they did for example in one over a fallen tree. The Board declined to even consider ████████ request that one of the posters be removed from a PHOA committee, even though the Board removed ████████ from the same committee a few months later.[34]

G.    Harm to Complainants

Complainants are forty voucher-tenants, eleven landlords, two housing authorities, and

---

[33] R.S. was arrested for allegedly taking a credit/debit card from an acquaintance and using it to pay for utilities and make purchases at Walmart.

[34] Ms. Dautrich claims that the reason Ms. Wilhite was removed from the committee was that she made a joke about selling drugs to kids.

12

Exhibit 1 - page 35

four residents who opposed the Rules.  Each set of Complainants was harmed by Respondents actions in the following ways.

Complainant voucher-tenants experienced harms that permeated throughout multiple aspects of their lives.  At least nineteen households moved out of Providence Village because of the Rules, while all feared homelessness when they were threatened with eviction.  They also felt unsafe in their homes from the Rules and the rhetoric they prompted, leading some to purchase security cameras and other safety measures.  Some also lost wages, and even their jobs, from taking time off to move.  Additionally, several Complainants had extreme difficulty finding alternative housing, compelling them to move further away for inferior quality housing at a greater expense.  They also incurred moving costs, including lost security deposits, moving equipment fees, furniture they did not have time to move, application fees, hotel costs, travel expenses, and attorneys' fees.

Complainant landlords incurred significant expenses because of the Rules.  To find new tenants, they had to pay for advertising and repairs.  They also had to pay registration fees to PHOA, and they lost money from units being vacant and from having to accept lower rents when they were forced to quickly find new tenants.  Additionally, some landlords spent extensive time discussing the Rules with their tenants and with PHOA, assessing their compliance obligations, traveling to and from Providence Village, and fixing homes for rent, resulting in travel expenses and lost wages.  The Rules also caused these landlord severe stress and anxiety.

Complainant housing authorities incurred extensive costs because of the Rules.  These included the time and expense of administering so many moves in a short timeframe and of meeting with tenants and landlords to help them understand the impact of the Rules and how to comply.  In addition, housing authority staff spent time on educational activities to combat the increased stigma about the HCV Program that came from Respondents' actions.  They also incurred attorneys' fees.

Complainant residents who opposed the Rules experienced fear and stress from being attacked for their support for diverse communities.  Residents felt unsafe in their homes, questioned interracial relationships, and at times felt they would have to move because they were no longer wanted in their community.  They also lost the benefits of interracial associations, as their Black voucher-holder neighbors moved away from Providence Village because of the Rules and the intimidating rhetoric that followed.

## VI.    Findings of No Reasonable Cause

There is insufficient evidence that Respondents enacted the Rules for reasons that were discriminatory based on national origin, sex, familial status, or disability.  Although residents made statements that were egregiously discriminatory on some of these bases, based on the information available to the Department at this time, there is not reasonable cause to believe that these views motivated Respondents' actions that are the subject of this Determination.[35]

## VII.   Findings of Reasonable Cause

There is reasonable cause to believe Respondents PHOA, First Service, Dautrich and Watson violated Subsections 804(a) and 804(b) of the Act by discriminating because of race and

---

[35] The Department notes that Respondents have failed to collect and produce information and a significant number of documents requested during the course of its investigation.

13

Exhibit 1 - page 36

color. There is also reasonable cause to believe Respondents PHOA and Dautrich violated Section 818 of the Act by interfering with the rights of Complainants ██████████████ ████████████████ to pursue an administrative fair housing complaint and retaliating against them for doing so. Lastly, there is reasonable cause to believe Respondents PHOA, FirstService, Dautrich and Watson violated Section 818 of the Act for failing to take corrective action for the harassment of Complainants.

### A.    Subsections 804(a) and 804(b)

Subsection 804(a) of the Act prohibits making a dwelling unavailable because of a protected characteristic.[36] Subsection 804(b) of the Act prohibits discrimination in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with the rental of a dwelling because of a protected characteristic.[37]

Discrimination under Subsections 804(a) and 804(b) can be proven by considering the following factors: (1) whether the consequences of an action bear more heavily on certain groups; (2) the historical background of the action; (3) the sequence of events leading up to the action; (4) departures from normal procedural process; (5) departures from normal substantive criteria; and (6) the legislative and administrative history.[38]

#### 1.    Consequences of Action

The Rules predominantly and disproportionately impacted people who are Black. Nearly all of those targeted by PHOA's efforts are Black. As of 2022, 93% of voucher-households in PHOA were Black. In addition, the residents targeted by these efforts were *disproportionately* Black. While 93% of voucher-households in PHOA were Black, only 14% of all households in PHOA's neighborhood were Black.

The Board and other residents knew that by targeting voucher-holders they would be targeting the Town's Black residents, and they acted on this knowledge. The strong correlation between using a voucher and being Black was well known in Providence Village. In fact, Board members and other residents often connected or conflated the two in social media posts, or presumed whenever an incident involved someone Black that the person was a voucher-holder.

#### 2.    Historical Background

The inception of the Rules coincided with two occurrences involving Black residents. First, the discussions that led to the Rules began when the number and concentration of Black residents in the Town was increasing. At the same time, the concentration of voucher-holders remained about the same and exceedingly small, suggesting that residents were conflating being Black with being a voucher-holder. Second, the Board and other residents began focusing on voucher-holders following an altercation between a Black teenager and a White teenager, even though they did not in fact know whether the Black teenager belonged to a voucher-household.

Moreover, the full course of Respondents' efforts to restrict voucher-holders through the second set of rental rules in May 2024 took place against the backdrop of explicitly racist and

---

[36] 42 U.S.C. § 3604(a); *see also* 24 C.F.R. § 100.50(b)(3).

[37] 42 U.S.C. § 3604(b); *see also* 24 C.F.R. § 100.65(a).

[38] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). These factors are non-exhaustive and not all must be shown to establish a violation. *See Ave. 6E Invs. LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016); *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016).

14

Exhibit 1 - page 37

threatening posts and two protests by a White nationalist group.[39]  Residents who shared these views were some of the most vocal proponents of the Boards' continued efforts to restrict voucher-holders.  The Board did disavow the protests, but it did not once consider backing down even though it knew that many residents who supported its efforts did so for racist reasons.

### 3.    Sequence of Events

By enacting the Rules and subsequently trying to achieve the same result through other means, Respondents acted on and gave effect to discriminatory views about voucher-holders.[40] Board members actively participated in social media groups where posts routinely used racial language and stereotypes for voucher-holders, such as "ghetto," "trash," "lazy," "riff raff," and "wild animals."  Rather than distancing themselves from these posts, Board members and Amendment Committee members responded with positive emojis or used them as jumping off points to promote the Amendment.  Board members and Amendment Committee members also joined other residents on social media in presuming whenever a crime was committed that the perpetrator was a voucher-holder, especially when the person was known to be Black.

In addition, Respondents refused to do anything meaningful in response to repeated requests by opponents of the Rules to curb the aggression and threats being directed at them for supporting their predominantly Black voucher-holder neighbors.  Mr. Watson admitted discussing the tenor of the social media comments with multiple Board members, yet Respondents let the hostility continue to escalate, despite taking action to address and end less severe neighborhood disputes.

### 4.    Procedural Departures

Respondents pushed the Rules forward with unusual fervor and urgency.  No other vote prompted the Board to create a special committee, to undertake a coordinated canvassing campaign, or to promote the issue so vehemently by email and on social media.  The Board then set the Rules to go into effect long before hiring the staff needed to enforce them, even though this challenge had been flagged for them early on.  The Board sent a letter to the community announcing the Rules before they had been finalized and while changes were still being made. Inconsistent start dates were announced and the reasons for changes not fully explained. Respondents also continued to seek ways to implement the Rules even after they were invalidated by state law and even after committing not to do so through the Stay agreement.

Respondents sought to ensure a specific outcome, rather than engage in and act based on an informed discussion with the full community.  Unlike for other amendments, the Board sought broad authority so that they would not have to allow community input on the Rules themselves.

---

[39] Relevant evidence for the historical background includes "repeated attempts to restrict certain types of housing … disproportionately utilized by African-Americans." *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 641 F. Supp. 2d 563, 570 (E.D. La. 2009); *see also Jim Sowell Constr. Co. v. City of Coppell*, 61 F. Supp. 2d 542, 547 (N.D. Tex. 1999) ("Evidence relevant to this factor is the [Defendant's] response to prior similar proposals").

[40] Courts consider statements made by supporters of an "ultimately enacted initiative" to be "relevant evidence of discriminatory intent."  *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-197 (2003); *see also People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 732 (E.D. Va. 1992) ("It is sufficient for Plaintiffs to show that the City acted for the sole purpose of effectuating the desires of its private citizens, that racial or other improper considerations were a motivating factor behind those desires, and that City decision makers were aware of the motivations of the private citizens.") (citing *United States v. City of Birmingham*, 538 F. Supp. 819, 828 (E.D. Mich. 1982), *aff'd as modified*, 727 F.2d 560 (6th Cir. 1984)).

Exhibit 1 - page 38

From the outset, the Board planned to hold open the vote until the Amendment passed, which it had never done before, and it made a show of collecting in-person votes at the June 1st meeting, even though by that point the results were set. The Board and the Amendment Committee also stoked confusion over the effect of the vote, the draft rules, and the Q&A document, and then took no questions or comments from residents when finally voting on the Rules themselves, despite holding the vote during an open meeting. Although the Q&A assured residents they would not lose their housing or tenants mid-lease, that was precisely what the Board tried to do when the Rules first passed.

### 5.    *Substantive Departures*

Respondents lacked substantive support for their actions, suggesting that they acted based on discriminatory biases and stereotypes. Respondents have provided three justifications for excluding voucher-holders from Providence Village: crime, maintenance, and property values. However, Respondents had no data, studies or other comprehensive sources of information showing these to be real problems – let alone problems caused by voucher-holders – when they decided to focus on getting voucher-holders out of Providence Village. In fact, to date Respondents have yet to produce any information tying voucher-holders to any such problems.

Respondents also did not meaningfully consider any less drastic alternatives before proceeding with the Rules, even though this approach required them to bring on additional full-time staff and even though it would have displaced hundreds of their residents with no history of being bad tenants. Respondents proceeded without waiting to see if their new security firm and cameras might suffice to address any of the purported problems. When landlords requested specifics about crime and maintenance issues so that they could address them, Respondents ignored these requests.

### 6.    *Legislative and Administrative History*

The steps taken by Respondents to enact the Rules show a determination to proceed in the face of many legal and other concerns. Respondents proceeded to enact the Rules even after residents and others flagged that they would likely violate fair housing laws. Throughout the process, residents told the Board that they believed the Rules to be racist, but the Board did not even pause to take these views into account. To the contrary, when Mr. Watson initially flagged legal concerns with the Rules, Ms. Dautrich sought out another FirstService representative who could overrule his opinion.

When the Rules went into effect, Mr. Watson immediately made exceptions for many of the provisions but refused to do so for the voucher-holder rule despite a flood of requests. In addition, messaging from the Board as to when and how enforcement of the voucher-holder rule would begin kept shifting.

Respondents continued to try to achieve the same results as the Rules through other means for another two years, thereby attempting to circumvent a state law and the Stay. They persisted with these efforts despite still having no comprehensive information tying voucher-holders to the problems they sought to address and despite residents continuing to raise fair housing concerns.

*** 

Respondents defend their conduct by asserting that the Rules were not based on race, but

16

Exhibit 1 - page 39

rather necessary to address crime, maintenance issues, and property values.[41]  However, as discussed above, they did not have data or other information substantiating these problems – let alone tying them to voucher holders.[42]

Respondents later pointed to certain specific crimes but could not explain to HUD why they believed any of these crimes were committed by a voucher-holder, and admitted not knowing who committed some of them.  During HUD's investigation, Respondents also produced three collections of crime data, all of which were obtained or created post hoc and were over- or under-inclusive.  These documents contained limited information about the perpetrator, covered a broader geography than PHOA, and/or were based on calls for all emergency services (i.e. not just police services).[43]  For one of these documents, Ms. Dautrich searched only for crimes at properties she believed were rentals, without similarly scrutinizing owner-occupied properties.

***

Taking all of this evidence into account, there is reasonable cause to believe that Respondents PHOA, FirstService, Dautrich, and Watson discriminated because of race and color in violation of Subsections 804(a) and 804(b) of the Act.

B.      Section 818

*1. Interference and Retaliation*

Section 818 of the Act makes it unlawful "to coerce, intimidate, threaten, or interfere with any person . . . on account of his having exercised . . . any right granted or protected" by the Act.[44]  Prohibited conduct includes "[r]etaliating against any person because that person has made a complaint . . . under the Fair Housing Act."[45]

---

[41] Board members and other residents at times complained about voucher-holders driving property values down and at other times complained that investors purchasing properties to rent to voucher-holders was driving property values (and taxes) up.

[42] Courts have found unsubstantiated references to crime to be "nothing more than camouflaged racial expressions." *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 648 F. Supp. 2d 805, 812 (E.D. La. 2009) (quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982)); *see also Atkins v. Robinson*, 545 F. Supp. 852, 874 (E.D. Va. 1982) (statements about "an abundance of crime" and that "crime was on the rampage" found to be evidence of racially discriminatory intent).  Courts have found similarly regarding claims about property values. *See Mhany Mgmt., Inc.*, 819 F.3d at 608(concluding that warnings that property values might decrease if affordable housing units were built "reflected race-based animus"); *St. Bernard Parish*, 648 F. Supp. 2d at 818-19 (finding that unsupported justification that property values would decline constituted a substantive departure from the normal decision-making process).

[43] Using 911 calls as evidence of criminal activity can also have a harmful impact on women, individuals with disabilities, and persons of color.  *See* HUD, OFFICE OF GENERAL COUNSEL GUIDANCE ON APPLICATION OF FAIR HOUSING ACT STANDARDS TO THE ENFORCEMENT OF LOCAL NUISANCE AND CRIME-FREE HOUSING ORDINANCES AGAINST VICTIMS OF DOMESTIC VIOLENCE, OTHER CRIME VICTIMS, AND OTHERS WHO REQUIRE POLICE OR EMERGENCY SERVICES 4 (2016), https://archives.hud.gov/news/2016/pr16-134-FinalNuisanceOrdGdnce.pdf; Letter from Kristen Clarke, Assistant Att'y Gen., Dep't of Justice Civil Rights Division, to State and Local Police Dep'ts and Gov'ts 2 (Aug. 15, 2024), https://www.justice.gov/d9/2024-08/doj_crime-free_and_nuisance_letter.pdf.

[44] 42 U.S.C. § 3617.

[45] *See United States v. Wagner*, 940 F. Supp. 972, 978-82 (N.D. Tex. 1996) (holding that homeowners violated § 818 of the Fair Housing Act "when they filed the 1991 state lawsuit"); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124-25 (9th Cir. 2001) (concluding that city's civil action against a fair housing organization may be considered a retaliatory action giving rise to a claim under § 818 of the Act).

Exhibit 1 - page 40

Respondents PHOA and Dautrich interfered with the rights of Complainants ████ ██████████████████████ to pursue an administrative fair housing complaint and retaliated against them for doing so. In February 2024, Ms. Dautrich, on behalf of PHOA, filed legal proceedings in state court against these five Complainants specifically because they were complainants in the matter before HUD. The state court found the suit to be meritless and ruled that it was filed in response to Complainants' participation in HUD's investigation. These proceedings caused Complainants emotional distress, including fear for their safety after having their addresses publicized.

Thus, there is reasonable cause to believe that Respondents PHOA and Dautrich violated Section 818 of the Act.

### 2. *Failing to Take Prompt Action to Correct Intimidation and Harassment*

Section 818 of the Act also prohibits intimidation and harassment because of race or color or because of engagement in activity protected by the Act.[46] Third parties can be held liable if they "knew or should have known" of the harassment "had the power to correct it," and failed "to take prompt action."[47]

Complainants were repeatedly harassed because of their race, because of the race of those they were supporting, and/or because of their pursuit of a fair housing complaint. For years, Residents posted threatening and derogatory comments about Complainants, including a post with a photo of them and their children taken without their knowledge or consent.

Respondents knew that such harassment was ongoing. Members of the Board were active participants in many of the social media groups in which the harassment occurred and Complainants reached out to Cody Watson and the Board directly about the ongoing campaign of harassment along with the persistent fear it was causing.

Respondents had the power to correct the harassing conduct. In other situations, both before and after the passage of the Amendment, Respondents resolved and mediated disputes between neighbors of about a wide range of issues and even called the police on occasion. Respondents refused Complainants' request to remove the person who took the photograph from a Board committee despite removing a Complainant's wife from the same committee for less egregious conduct. Despite their knowledge that harassment was rampant for a long time and their ability to take corrective action, Respondents failed to do anything meaningful to stop the harassing conduct or to mitigate its effects.

## VIII. Conclusion

Based upon the information set forth above, the U.S. Department of Housing and Urban Development has concluded that there is reasonable cause to believe that Respondents violated Subsections 804(a) and 804(b), and Section 818 of the Fair Housing Act.

This Determination addresses only the violations of the Fair Housing Act alleged in the complaint and does not address any potential violations of any other provision of law. A determination of reasonable cause is limited to the facts developed in a specific investigation.

---

[46] 42 U.S.C. § 3617; 24 C.F.R. §§ 100.400(b), (c)(2), (c)(4), 100.600.

[47] 24 CFR 100.7(a)(1)(iii); *see also* Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed. Reg. 63,054, 63,068 (Sep. 14, 2016) (describing a "community association's liability" to act to correct harassing conduct).

18

Exhibit 1 - page 41

## IX.    Additional Information

### A.  Complainants' Rights Related to HUD's Findings of No Reasonable Cause

Notwithstanding this determination by HUD, the Fair Housing Act provides that the complainant may file a civil action in an appropriate federal district court or state court within two years after the occurrence or termination of the alleged discriminatory housing practice. The computation of this two-year period does not include the time during which this administrative proceeding was pending. In addition, upon the application of either party to such civil action, the court may appoint an attorney or may authorize the commencement of or continuation of the civil action without the payment of fees, costs, or security, if the court determines that such party is financially unable to bear the costs of the lawsuit.

The Department's regulations implementing the Act require that a dismissal, if any, be publicly disclosed, unless the complainant or respondent requests that no such release be made. 24 C.F.R. § 103.400(a)(2)(ii).  The request must be made by the complainant or respondent within thirty (30) days of receipt of the determination to Director, Office of Enforcement, Office of Fair Housing and Equal Opportunity, 451 Seventh Street, SW, Washington, DC 20410. Notwithstanding such request by the complainant or respondent, the fact of a dismissal, including the names of all parties, is public information and is available upon request.

### B.    Final Investigative Report

A copy of the final investigative report can be obtained from:

> FHEO, Region VI
> U.S. Department of Housing & Urban Development
> 307 W. 7th Street. Ste. 1000
> Fort Worth, TX 76102

On behalf of the Department of Housing and Urban Development

DocuSigned by:

33CD6962EC624B2...

Christina Lewis, Director
Fort Worth Regional Office of FHEO
Region VI

1/14/2025

Date

19

Exhibit 1 - page 42