# Exhibit A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| *JOHNSON ET AL.*, | Case No. 4:25-cv-00418-ALM |
| Plaintiffs, | |
| | Judge Amos L. Mazzant, III |
| v. | |
| *PROVIDENCE HOMEOWNERS ASSOCIATION, ET AL.*, | |
| Defendants. | |

**Expert Witness Report of Dr. Shannon S. Van Zandt**

**TABLE OF CONTENTS**

I. Introduction and Expert Designation.................................................................................1

II. Summary of Opinions ....................................................................................................1

III. Basis and Reasoning for Opinions................................................................................1

IV. Data and Documents Considered..................................................................................7

V. Exhibits Supporting Opinions........................................................................................8

VI. Expert Qualifications ...................................................................................................9

VII. Prior Expert Testimony ..............................................................................................9

VIII. Compensation............................................................................................................9

IX. Signature and Date.......................................................................................................9

**Appendix -–Curriculum Vitae of Shannon VanZandt, Ph.D………………….….10**

## I. Introduction and Expert Designation

I, Shannon S. Van Zandt, Ph.D., have been retained by counsel for the above-listed plaintiffs in the above-captioned matter to provide expert analysis and testimony regarding the disparate impact of the Providence Homeowners Association's (PHOA) No Section 8 Housing policy on Black voucher tenants and female head-of-household voucher tenants. This report is prepared in accordance with Federal Rule of Civil Procedure 26(a)(2)(B).

## II. Summary of Opinions

Based on my review of the provided data, HUD reports, and relevant literature, I offer the following opinions:

1. The No Section 8 Housing policy enacted by PHOA and FirstService Residential Texas caused a statistically and practically significant disparate impact on Black voucher tenants and female head-of-household voucher tenants.

2. The policy was a robust cause of the discriminatory effect, resulting in the displacement of existing voucher tenants and the exclusion of future voucher tenants. The policy caused a disparate impact by prohibiting current and future leases that allowed Section 8. It directly impacted every single voucher lease by making each lease invalid.

## III. Basis and Reasoning for Opinions

To demonstrate disparate impact on a protected class under the Fair Housing Act (FHA), both legal and statistical frameworks must be carefully applied. Schwemm & Bradford's (2016) "Proving Disparate Impact in Fair Housing Cases After Inclusive Communities" and Aigner et al.'s (2024) "Statistical Approaches for Assessing Disparate Impact in Fair Housing Cases" offer complementary guidance on how to structure such a demonstration.

Schwemm & Bradford (2016) explain the three-step burden-shifting framework endorsed by the Supreme Court in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project*, 576 U.S. 519 (2015). First, the plaintiff must identify a specific, facially-neutral policy or practice that is being challenged. Second, the plaintiff must establish a *prima facie* case by showing that the policy robustly causes a statistically significant disparate impact on a protected class. Third, if the defendant can justify the policy as necessary to achieve a substantial, legitimate, nondiscriminatory interest, the plaintiff may still prevail by demonstrating that a less discriminatory alternative exists.

To support the *prima facie* case, Schwemm & Bradford (2016) emphasize four key factors that show the strength of statistical evidence: (1) the data must focus on the population

Van Zandt Expert Report

1

affected by the policy; (2) appropriate comparison groups must be used to show that the protected class is disproportionately harmed; (3) the analysis should rely on relative, not absolute, measures of impact; and (4) the disparity must be sizeable. They also discuss the importance of using local rather than national data. The Schwemm & Bradford (2016) article summarizes the standard used in FHA cases; it has been cited in four legal decisions, according to a search of Westlaw, and has been cited in 41 scholarly articles, according to Google Scholar, which is a widely-used source for quantifying citations in the academic world.

Aigner et al. (2024) build on this framework by further explaining rigorous statistical methodologies for measuring disparate impact. They recommend using the direct disparity ratio estimator in most cases, except in small samples, which is not an issue in this case where we have a full count of the affected populations. The disparity ratio is calculated by dividing the percentage of individuals in a legally protected class who are impacted by a housing policy by the percentage of individuals not in that class who are similarly impacted. For example, if 20% of Black households are affected by a policy and 5% of White households are affected, the disparity ratio is 4.0 (i.e., four times the number of Black households are affected than White households). This ratio provides a relative measure of impact, focusing on the proportionate harm rather than absolute numbers. Aigner and his colleagues identify a disparity ratio of 1.25 or greater as a rule of thumb in employment cases.

In *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.* 576 U.S. 519 (2015), the U.S. Supreme Court confirmed that disparate impact claims are cognizable under the FHA. However, the Court did not set a numerical threshold (such as a disparity ratio of 1.25) for when a claim becomes actionable. Instead, it emphasized a robust causality requirement between the challenged policy and the alleged disparity, and required plaintiffs to show that the disparity is significant and caused by the defendant's policy, not by other factors. *See id.* at 542. The Court also warned against statistical disparities alone being sufficient without causation and consideration of legitimate objectives. *See id.* at 540-542.

The disparity ratio is used as evidence here because it aligns with legal requirements to demonstrate that a policy has a meaningful and disproportionate adverse effect on a protected group compared to others. Courts and regulatory agencies use the disparity ratio as an important element of establishing *prima facie* evidence of disparate impact. *See* Aigner et al. (2024). This approach provides statistical proof based on meaningful comparisons between groups, supporting rigorous and consistent adjudication of discrimination claims under the FHA.

Together, these articles provide a comprehensive roadmap for demonstrating disparate impact in fair housing litigation. Schwemm & Bradford (2016) offer practical considerations, while Aigner et al. (2024) supply the statistical tools necessary to quantify and validate claims. A successful demonstration requires integrating both perspectives: identifying a clear policy, selecting appropriate data and comparison groups, and applying robust statistical tests.

2

Van Zandt Expert Report

## Background: The No Section 8 Policy and Related June 2022 Rental Restrictions from the Providence Homeowners Association (PHOA)

Based on my review of the HUD Charge of Discrimination and Determination against the Defendants (HUD Charge) and HUD's Final Investigative Report (HUD FIR) for the HUD Charge, the PHOA adopted several new rental restrictions in June 2022.[1] It was the No Section 8 ban that directly and immediately reduced the number of rental units in the neighborhood and eliminated units available to Housing Choice Voucher ("HCV," also called "Section 8") households. After the Rental and Leasing Rules were adopted in June 2022, the PHOA declared that *no* existing leases would be grandfathered and that, upon recordation of the rules, all homes occupied by voucher holders were automatically in violation, triggering a 30-day compliance window. HUD FIR, pp. 65, 89. According to the HUD FIR, PHOA Manager Cody Watson confirmed that once the rules were filed, each Section 8 property would receive a violation notice and, after 30 days, weekly fines of $300 would begin until the home was "no longer a part of any publicly financed or subsidized housing program." HUD FIR, p. 89.

As an immediate result of the policy every Section 8 landlord was effectively barred from continuing to lease to voucher tenants regardless of its end date and barred from entering into new leases for voucher tenants. Of the 165 voucher units affected, 153 were occupied by Black households, and 94% of the households were headed by females. HUD FIR, p. 91. Many landlords responded to the No Section 8 ban by issuing early move-out notices, declining renewals, and instructing voucher families that they had to leave. Voucher households reported receiving notices within days.

As a direct result, many voucher families moved out of the PHOA neighborhood in the weeks and months following the ban, including several who still had months left on their leases. HUD FIR, pp. 8, 10-12, 17-18, 20, 23-24, 26, 29-33, 36, 39-40, 46, 49. The rapid displacement occurred not because of the other rental restrictions adopted that summer, but because the No Section 8 rule made continued occupancy legally impossible for voucher tenants and financially untenable for landlords facing escalating fines. HUD FIR, pp. 18, 20, 24, 29-33, 39.

The PHOA also adopted several additional rental-restriction measures in June 2022—including a one-property-per-owner rule, mandatory rental-registration requirements, and restrictions on unlicensed lawn-care providers for renters. HUD Charge, p. 28; PHOA Rental and Leasing Rules, p. 6. These changes imposed new administrative and cost burdens on landlords and tenants, and they signaled a broader shift toward discouraging rental activity

---

[1] The HUD Charge was attached to Plaintiffs' Amended Complaint as Exhibit 1, and the HUD FIR as Exhibit 2. *See Johnson et al. v. Providence Homeowners Association et al.*, No. 25-cv-418, Dkt. No. 11-1, 11-2 (E.D. Tex. July 22, 2025). Throughout this report, I cite to "HUD Charge" and "HUD FIR" rather than those exhibit numbers.The page cited is the exhibit page number prather than the actual page number in the HUD document used to make the exhibit.

Van Zandt Expert Report

3

within the community. But unlike the No Section 8 ban, these other rules did not themselves require the immediate removal of any tenants or the immediate reduction of the number of occupied rental homes. Their enforcement mechanisms operated on longer timelines, provided for registration rather than eviction, and did not mandate that existing renters be displaced. HUD FIR, pp. 65, 74-75, 90.

### A. Disparate Impact on Black Voucher Tenants

To assess the possible disparate impact of the No Section 8 policy on Black voucher tenants, I relied on evidence from the HUD FIR to determine the number of voucher households residing in the Providence HOA at the time that the policy was passed by the HOA. *See* Exhibit A *infra*.

According to the HUD FIR, at the time the No Section 8 ban was passed, 165 PHOA units were leased to voucher tenants, 153 of which were Black and 10 of which were Non-Hispanic White. HUD FIR, p. 91. Thus, the percentage of Black voucher tenants whose leases were terminated was 92.7% (calculated by dividing 153 by 165) and the percentage of Non-Hispanic White voucher tenants affected by the policy was 6.1% (calculated by dividing 10 by 165). Following Aigner et al. (2024), dividing 92.7 by 6.1 results in a Disparity Ratio of 15.2, which far exceeds the 1.25 threshold commonly-used and recommended by Aigner and his colleagues. Because the count of voucher tenants was a full census of residents obtained by HUD, not a sample, standard errors are not needed to assess significant differences. Thus, I find that **differences between the Black and Non-Hispanic White populations are both statistically and meaningfully different**. **I conclude that the No Section 8 policy passed and implemented by the Defendants caused a disparate impact, harming Black tenants.**

### B. Disparate Impact on Female Head-of-Household Voucher Tenants

To assess the impact of the policy on female heads of household voucher tenants, I used the same approach--comparing the rejection or exclusion rates for female to male heads of household, using data provided in HUD's Picture of Subsidized Housing database from 2022. *See* Exhibit B *infra*.

HUD data from 2022, the year the No Section 8 policy was enacted, show that 94% of voucher households in Providence Village were headed by females, while the remaining 6% were headed by males. Thus, the Disparity Ratio for female-headed households was 15.7 (calculated by dividing 94 by 6), again greatly exceeding the 1.25 threshold. Since the percentages are based on full counts (not samples) of voucher tenants, the **differences are both statistically and substantially different**. **I conclude that the No Section 8 policy disproportionately impacted female-headed households, many of whom were single mothers.**

### C. Robust Causation

Following the framework articulated in *Inclusive Communities Project v. Lincoln Property Co.*, 920 F.3d 890 (5th Cir. 2019), in the sections below, I examine whether the statistical

4

Van Zandt Expert Report

disparities—including the magnitude of disparity ratios—and rental-market effects associated with the policy at issue are sufficiently substantial to support an inference that the policy itself caused the adverse outcomes for the protected class.

The Record that includes the HUD Charge and HUD FIR states the following facts that correspond directly to this causation test:

### 1. Identifiable Policy Change Affecting the Rental Market

The Record provides evidence that the PHOA enacted a set of June 2022 rental restrictions that categorically barred participation in Housing Choice Voucher (HCV) programs, invalidated all existing voucher leases without grandfathering, and imposed $300-per-week enforcement fines on landlords who continued renting to voucher tenants. HUD Charge, p. 19; HUD FIR, pp. 49, 68, 89, 90.

From a causation standpoint, this constitutes a specific, discrete policy change that can be analyzed separately from broader market factors. The challenged rules had immediate operational force, creating an identifiable point at which housing opportunities for voucher households were sharply reduced.

### 2. Clear, Quantifiable Reduction in Housing Opportunities

The HUD FIR shows that 165 units occupied by voucher families became unavailable to voucher tenants at the moment the rules were adopted, because every existing voucher lease was rendered noncompliant and subject to fine-based enforcement. HUD FIR, p. 91.

These 165 units represent the entire stock of HCV-occupied housing within the neighborhood. Under the *Lincoln* framework, the removal of this entire set of units from the available housing pool is a direct and measurable reduction in housing opportunities, rather than an indirect or speculative effect.

### 3. Statistical Disparities Tied to a Protected Class

My analysis of HUD data confirms that 92.7% of the voucher households in Providence Village were Black and 6.1% were White at the time the policy was enacted. HUD FIR, p. 91. Using the disparity-ratio formulation suggested by Aigner et al. (2024), the ratio of impact on Black versus White voucher households is 15.2, meaning Black voucher households were 15 times more likely to be affected than White voucher households.

Similarly, 94% of voucher households were female-headed, compared to 6% male-headed, producing a female-to-male disparity ratio of 15.7. These ratios far exceed the 1.25 threshold commonly used in disparate-impact evaluation.

Because the policy eliminated all voucher tenancies at once, these disparities translate into a uniform adverse impact on protected groups. The disparity ratios are sufficiently large, stable,

Van Zandt Expert Report

5

and derived from full-population counts to support the inference, under the *Lincoln* test, that the policy itself, rather than chance or background market conditions, produced the observed racial and gender patterns.

### 4. Direct Causal Pathway Between the Policy and the Harms Experienced

The HUD FIR finds that the HOA's enforcement timeline—imposing violations after 30 days and fines after 90 days—caused landlords to:

- issue nonrenewals,
- shorten lease terms,
- refuse renewal options, and
- instruct tenants to vacate early. HUD FIR, p. 65.

The HUD FIR also provides testimony on how tenants experienced:

- homelessness,
- sudden relocation,
- loss of employment,
- long commutes,
- educational disruption for children, and
- significant monetary losses related to emergency moving. HUD FIR, pp. 8, 10-12, 17-18, 20, 23-24, 29-30, 32-33, 36, 39-40.

From a causation perspective, these effects are consistent with a policy that instantaneously eliminates all authorized voucher housing. Neither the HUD Charge nor the FIR attribute these outcomes to neighborhood economic trends or regional rental pressures; rather, it alleges a linear causal chain beginning with the PHOA rule and ending with the forced displacement of voucher families.

### 5. Absence of Alternative Explanations that Could Account for the Disparities

The HUD Charge states that the PHOA defended the rules by pointing to alleged crime, property-value declines, and neighborhood disorder. The HUD record cited alleges that no data has been presented to support these claims, that police data do not show such patterns, and that many cited incidents were unrelated to voucher households. HUD Charge, pp. 18, 27, 38-39.

Under the *Lincoln* test, when a policy-induced disparity is substantial, and when alternative explanations lack empirical support, it strengthens the inference that the policy itself, rather than confounding factors, produced the reduction in opportunity observed for the protected class.

### 6. Community Conditions That Intensified the Policy's Effects

Van Zandt Expert Report

6

HUD finds and provides evidence that social media-based hostility, directed disproportionately at Black residents and voucher tenants, heightened pressures to move, made families feel unsafe, and contributed to rushed or destabilizing relocations. HUD Charge, pp. 12, 18-20, 26-30, 35; HUD FIR, pp. 5, 6, 22, 57-64, 67, 70-73.

In the *Lincoln* framework, this type of community environment does not replace the policy as the causal factor; instead, it provides additional context showing how the policy operated in real-world conditions and why its effects were both swift and severe.

*7. Overall Causal Inference Supported by the HUD Charge and FIR*

Taken together, the HUD Charge and HUD FIR outline the following causal structure, consistent with the *Lincoln* test:

1. A specific policy barred all voucher leasing.
2. The entire voucher-occupied housing stock (165 units) was impacted at once.
3. This action fell disproportionately on populations that were 92.7% Black and 94% female-headed, with disparity ratios of 15.2 and 15.7, respectively.
4. The timing and mechanism of the policy directly precipitated nonrenewals, evictions, homelessness, and forced relocations.
5. There is no evidence that any alternative neighborhood conditions plausibly explain the magnitude or suddenness of the displacement.
6. An environment of hostility exacerbated the harm but did not substitute for the policy's causal role.

## IV. Data and Documents Considered

- Plaintiffs' Amended Complaint in *Johnson et al. v. Providence Homeowner's Association et al.*
- HUD Charge of Discrimination and Determination of Reasonable Cause, attached as Exhibit 1 to Plaintiffs' Amended Complaint in *Johnson et al. v. Providence Homeowner's Association et al.*
- Excerpts of HUD Final Investigative Report, attached as Exhibit 2 to Plaintiffs' Amended Complaint in *Johnson et al. v. Providence Homeowner's Association et al.*
- Providence Homeowners Association Rental and Leasing Rules
- HUD Picture of Subsidized Housing data (2022)
- Data dictionaries and query forms for HUD Picture of Subsidized Households: 2022
- *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519 (2015)

Van Zandt Expert Report

- *Inclusive Communities Project v. Lincoln Property Co.*, 920 F.3d 890 (5th Cir. 2019)
- 5-year estimates from the American Community Survey, years 2015-2023, for Providence Village town (Census Place)
  - B25003: Tenure (Owner vs. Renter Occupied)
  - A10008: Households by Household Type (Including Female Householder, No Spouse Present)
  - A10010: Households by Race of Householder
- Academic Literature:
  - Aigner, D. J., del Ángel, M., & Wiles, J. (2024). Statistical Approaches for Assessing Disparate Impact in Fair Housing Cases. Statistics and Public Policy, 11(1), 2263038.
  - Schwemm, R. G., & Bradford, C. (2016). Proving disparate impact in fair housing cases after inclusive communities. *NYUJ Legis. & Pub. Pol'y*, *19*, 685.

## V. Exhibits Supporting Opinions

Exhibit A. Disparity Ratio for Non-Hispanic Black Section 8 (HCV) Households. Author's calculations from data included in HUD's Final Investigative Report, attached as Exhibit 2 to Amended Complaint in *Johnson et al. v. Providence Homeowner's Association et al.*

| Data from 2022 | | % Black Non-Hispanic (Total Black/Total Units) | % White Non-Hispanic (Total White/Total Units) | % Hispanic (Total Hispanic/Total Units) | Disparity Ratio (% Black/% White) |
|---|---|---|---|---|---|
| Total HCV Units | 165 | | | | |
| Total Black Households | 153 | 92.7 | | | 15.2 |
| Total White Non-Hispanic | 10 | | 6.1 | | |
| Total Hispanic | 5 | | | 3.0 | |

Exhibit B. Disparity Ratio for Female-Headed Households. Author's calculations from data retrieved from HUD's Picture of Subsidized Housing.

Van Zandt Expert Report

| | | | | | |
|---|---|---|---|---|---|
| Total White Non-Hispanic | 10 | | 6.1 | | |
| Total Hispanic | 5 | | | 3.0 | |

Exhibit B. Disparity Ratio for Female-Headed Households. Author's calculations from data retrieved from HUD's Picture of Subsidized Housing.

| Year | % Female-Headed Household in HCV units | % Male-Headed Household in HCV units | Disparity Ratio (% Female Headed/% Male-Headed) |
|---|---|---|---|
| 2022 | 94 | 6 | 15.67 |

## VI. Expert Qualifications

I am a tenured Professor of Landscape Architecture & Urban Planning and Director of the Center for Housing & Urban Development at Texas A&M University. I hold a Ph.D. in City & Regional Planning from the University of North Carolina at Chapel Hill (2004). My research focuses on housing policy, disaster recovery, and social equity in urban planning. I have authored well over 50 peer-reviewed publications and am widely-recognized as a national expert on low-income housing.

A curriculum vitae and list of publications is attached as an appendix to this report.

## VII. Prior Expert Testimony

I have never testified as an expert in a lawsuit.

## VIII. Compensation

My hourly rate for report preparation is $400/hour, and for testimony is $500/hour.

## IX. Signature and Date

Signed: *Shunn Van Zandt*

Date: 12-19-2025

9

Van Zandt Expert Report